Allegis Grp., Inc. v. Zachary Piper LLC, 2013 NCBC 13.

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| --- | --- |
| | SUPERIOR COURT DIVISION |
| COUNTY OF DURHAM | 12 CVS 2984 |

ALLEGIS GROUP, INC., AEROTEK, INC. and TEKSYTEMS, INC., )
)
)
    Plaintiffs, )
)
    v. )
)
ZACHARY PIPER LLC, ZACHARY PIPER, LLC NORTH CAROLINA, PIPER ENTERPRISE SOLUTIONS NORTH CAROLINA, LLC, JUSTIN JORDAN, DANIEL CURRAN, and MICHAEL NICHOLAS, )
)
)
)
)
)
    Defendants. )
)
)

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS**

{1}     THIS MATTER is before the court on Plaintiffs' Motion for Preliminary Injunction ("P.I. Motion") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure ("Rule(s)"), and Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Motion to Dismiss"), pursuant to Rule 12(b)(6).  The Motion for Preliminary Injunction is DENIED, and the Motion to Dismiss is GRANTED as to fiduciary duty claims against Daniel Curran and Michael Nicholas, but is otherwise DENIED.

> *Littler Mendelson, PC by Ryan R. Crosswell, Stephen Douglas Dellinger, Paul J. Kennedy (pro hac vice), and Jacqueline Johnson Lichty (pro hac vice) for Plaintiffs.*

> *Jordan Price Wall Gray Jones & Carlton, PLLC by Lori P. Jones and Paul T. Flick, and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. by Jillian M. Collins (pro hac vice), Katharine O. Beattie (pro hac vice), and Donald W. Schroeder (pro hac vice) for Defendants.*

Gale, Judge.

## I. INTRODUCTION

{2}     Plaintiffs Allegis Group, Inc. ("Allegis"), Aerotek, Inc. ("Aerotek"), and TEKsystems, Inc. ("TEKsystems"), (collectively, "Plaintiffs") seek injunctive and monetary relief against Defendants Zachary Piper LLC ("ZP"), Zachary Piper, LLC North Carolina ("ZP-NC"), and Piper Enterprise Solutions North Carolina, LLC ("PES-NC") (collectively, the "Corporate Defendants"), and Justin Jordan ("Jordan"), Daniel Curran ("Curran"), and Michael Nicholas ("Nicholas") (collectively, the "Individual Defendants"). The Individual Defendants are former Aerotek employees.

{3}     Plaintiffs allege that Jordan, a former high level Aerotek executive, established the Corporate Defendants in order to compete with Plaintiffs and seeks to do so with an unfair advantage by misappropriating Plaintiffs' trade secrets and systematically raiding trained Aerotek employees with whom Jordan formerly worked closely. The Amended Complaint asserts tortious interference with contracts of former Aerotek employees. Litigation for the actual breach of those contracts was instead brought in Maryland.

{4}     The questions now before the court are whether Plaintiffs have adequately stated a claim for relief, and if so, whether they have demonstrated a probability of success on those claims adequate to justify the issuance of a preliminary injunction. The Motions raise issues of a competitor's privilege and the extent to which Plaintiffs can rely on a doctrine of inevitable disclosure to secure an injunction in regard to claimed trade secrets.

## II. PROCEDURAL HISTORY

{5}     Aerotek and TEKsystems filed a Verified Complaint against the Corporate Defendants on May 3, 2012, accompanied by a Motion for Temporary Restraining Order and Preliminary Injunction. The case was designated as a mandatory complex business case on May 16, 2012, and assigned to the

undersigned on May 21, 2012. A May 29, 2012 Consent Order allowed expedited discovery to proceed before a hearing on the P.I. Motion.

{6} Plaintiffs filed their Amended Complaint on June 13, 2012, adding as a Plaintiff Allegis, which owns both Aerotek and TEKsystems, and adding the Individual Defendants. Defendants filed their Motion to Dismiss Plaintiffs' Amended Complaint on July 10, 2012. Plaintiffs filed their P.I. Motion on July 16, 2012 seeking to enjoin the Corporate Defendants and Jordan from:

a) Employing the following individuals with whom Plaintiffs had employment contracts and whose departure from Aerotek is now the subject of Plaintiffs' suit, namely: Michael Nicholas, Daniel Curran, Christopher Hadley, Ana Neto Rodrigues, and Alexander Ferrello;

b) Continuing to solicit employees of Aerotek to cease employment with Aerotek to join Defendants' Companies or its affiliates;

c) Continuing to divert business from Aerotek through tortious interference with their employment contracts, unlawful competition and deceptive trade practices, and misappropriation of their confidential business information; and

d) Continuing to misappropriate Plaintiffs' confidential information.

(Mot. for Prelim. Inj. 1–2.)

{7} The court heard the P.I. Motion on July 18, 2012. Briefing on the Motion to Dismiss was not complete at that time, but the court's review of the briefs on the Motion to Dismiss which are now complete reflects that issues in these briefs were, at least in the main part, fully argued at the hearing on the P.I. Motion. After the P.I. Motion hearing, the Parties requested that the court withhold ruling pending a mediation effort. No settlement resulted and the Parties requested that the court resume its consideration of the pending motions. The court proceeds to rule on the P.I. Motion and the Motion to Dismiss without further argument.

# III. STATEMENT OF FACTS

{8}     For purposes of the Motion to Dismiss, the court assumes the facts alleged in the Amended Complaint to be true and makes inferences in Plaintiffs' favor while not being bound by legal conclusions.  As to the P.I. Motion, the court examines both the pleadings and additional evidence submitted to determine whether Plaintiffs have satisfied their burden of securing preliminary injunctive relief.  Any findings in that regard are solely for purposes of the P.I. Motion, are not otherwise binding, and do not become "law of the case."

## A. The Parties

### 1. Plaintiffs

{9}     Allegis owns both Aerotek and TEKsystems, which are each staffing companies that find and place employees in temporary and permanent positions. Aerotek primarily focuses on "satisfying the scientific, software, engineering, and administrative needs of its clients," as well as staffing the Department of Defense and other governmental entities.  (Mot. for Prelim. Inj. 2 ¶ 1.)  TEKsystems also staffs governmental entities including the Department of Defense, but primarily focuses on staffing information technology and communications positions.  (Am. Mem. in Supp. of Prelim. Inj. 3.)  Plaintiffs allege that Aerotek and TEKsystems share clients and confidential information and conduct joint employee training, such that employees of one company have access to confidential information of the other. (Am. Mem. in Supp. of Prelim. Inj. 4.)

### 2. Defendant Jordan

{10}     Jordan was first hired by Aerotek's predecessor Onsite Companies, Inc. in 1996.  (Am. Mem. in Supp. of Prelim. Inj. 5.)  He was promoted several times, in 2008 becoming Regional Vice President based at Aerotek's Fairfax, Virginia office. (Am. Mem. in Supp. of Prelim. Inj. 5.)  In this position, Jordan managed a team of

national salespeople and was responsible for the Mid-Atlantic Region, which included Virginia, Maryland, Washington D.C., West Virginia, Alabama, and Tennessee.  (Am. Mem. in Supp. of Prelim. Inj. 5.)  Jordan remained in that position until his resignation from Aerotek on February 20, 2009.  (Am. Mem. in Supp. of Prelim. Inj. 5.)  Jordan signed both an Aerotek Employment Agreement and an Aerotek Incentive Investment Plan Agreement ("IIP Agreement").

### 3. Former Aerotek Employees

{11}    Plaintiffs complain that the Corporate Defendants have hired six former Aerotek employees, and the employment contracts of five of them are the focus in this litigation: Michael Nicholas, Daniel Curran, Christopher Hadley, Ana Neto Rodrigues, and Alexander Ferrello (collectively the "Former Employees").[1] Each of the Former Employees signed an Aerotek Employment Agreement.

{12}    Nicholas worked for Aerotek from September 2006 until his resignation on January 3, 2012, at which time he was a National Account Manager in the Arlington, Virginia office.  (Am. Mem. in Supp. of Prelim. Inj. 9.)  Nicholas signed both an Aerotek Employment Agreement and an Aerotek IIP Agreement. (Am. Mem. in Supp. of Prelim. Inj. 15.)  Nicholas is currently employed by PES-NC in sales.  (Defs.' Am. Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. 14.)

{13}    Curran worked for Aerotek from September 2003 until his resignation on September 16, 2011, at which time he was a Director of Strategic Sales for Government Services at Aerotek's Washington, D.C. office.  (Am. Mem. in Supp. of Prelim. Inj. 9.)  Curran signed an Aerotek Employment Agreement and an Aerotek IIP Agreement.  (Am. Mem. in Supp. of Prelim. Inj. 9.)  Curran is currently employed by PES-NC in sales.  (Defs.' Am. Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. 14.)

{14}    Hadley worked for Aerotek from February 26, 2001 until his resignation on April 6, 2012, at which time he was a Director of Strategic Sales and

---

[1] Plaintiffs allege that Defendants have also hired Katherine Carter Glossin, a former Customer Support Associate for Aerotek.

Operations with the Government Services Group in Aerotek's Fairfax, Virginia office. (Am. Mem. in Supp. of Prelim. Inj. 5.) Hadley signed an Aerotek Employment Agreement. Hadley is currently employed by PES-NC in sales. (Defs.' Am. Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. 14.)

{15} Rodrigues worked for Aerotek from December 17, 2004 until her resignation on March 30, 2012, at which time she was an Account Manager in Aerotek's Arlington, Virginia office. (Am. Mem. in Supp. of Prelim. Inj. 9.) Rodrigues signed an Aerotek Employment Agreement. Rodrigues now works as a salesperson for Piper Enterprise Solutions, LLC, which is not a defendant and which is a separate entity from PES-NC. (Am. Mem. in Supp. of Prelim. Inj. 10 n.50; Defs.' Am. Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. 15.)

{16} Ferrello worked for Aerotek from June 11, 2007 until his resignation on March 30, 2012, at which time he was an Account Recruiting Manager at Aerotek's Fairfax, Virginia office. (Am. Mem. in Supp. of Prelim. Inj. 10.) Ferrello signed an Aerotek Employment Agreement. Ferrello now works for Piper Enterprise Solutions, LLC as its Director of Recruiting. (Defs.' Am. Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. 15.)

4. Corporate Defendants

{17} Certain restrictions in Jordan's IIP Agreement expired on August 21, 2011.

{18} ZP was incorporated in Virginia on September 21, 2009. (Am. Mem. in Supp. of Prelim. Inj. 7.) ZP's principal office is in Vienna, Virginia. (Am. Compl. ¶ 6.) Plaintiffs contend that ZP's website clearly shows that ZP is engaged in professional staffing services. (Am. Compl. ¶ 58–59, 61–63.) Defendants allege that ZP is not a "staffing" company, but rather is "a defense subcontractor . . . that provides technical staff augmentation through full program management in three core areas: (1) intelligence analysis and support; (2) information technology and communications; and (3) cyber solutions." (Defs.' Am. Mem. in Opp'n to Pls.' Mot.

for Prelim. Inj. 4.)  In short, the Parties dispute whether ZP competes with Plaintiffs.

{19}   ZP-NC was incorporated in North Carolina on November 3, 2011.  (Am. Compl. ¶ 46.)  Its principal office is in Durham, North Carolina.  (Am. Compl. ¶ 8.)

{20}   PES-NC was incorporated in North Carolina on September 15, 2011. (Am. Compl. ¶ 46.)  Its principal office is in Durham, North Carolina.  (Am. Compl. ¶ 9.)  Defendants describe PES-NC as "a niche recruiting firm focused on staffing within IT infrastructure, software development, and IT Systems engineering." (Defs.' Am. Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. 16.)

## B.  The Non-Compete and Non-Solicitation Covenants

{21}   There are non-compete and non-solicitation covenants in both the Aerotek Employment Agreement and the IIP Agreement.  All five of the Former Employees signed an Employment Agreement, but only Jordan, Nicholas, and Curran signed IIP Agreements.  (Am. Compl. ¶¶ 30–31, 43–44; Am. Mem. in Supp. of Prelim. Inj. 27.)

### 1.  The Aerotek Employment Agreements

{22}   Jordan's Employment Agreement included a Covenant Not to Divulge Confidential Information, pursuant to which Jordan permanently "agreed not to use, disclose or divulge any Confidential Information of Aerotek to any other person, company or entity."  (Am. Compl. ¶ 40.)

{23}   Employment Agreements for Nicholas, Rodrigues, and Ferrello prohibit:

> directly or indirectly engaging in, or preparing to engage in, employment with any business engaging in, or preparing to engage in, Aerotek's business for which the employee performed services during the two years prior to the termination of his employment and within a 50-mile radius from 1) the office in which he reported at the time of termination, or 2) any other offices in which he worked during the two years of employment.

(Am. Mem. in Supp. of Prelim. Inj. 11–12.) The Employment Agreements also include customer and employee non-solicitation provisions, which both last for 18 months following separation, and confidentiality and non-disclosure statements which continue for three years following separation. (Am. Mem. in Supp. of Prelim. Inj. 12.)

{24} Employment Agreements for Hadley and Curran include similar restrictive covenants, but have a wider geographic limit for the non-compete covenant based on their positions as Directors of National Sales. The non-compete covenants extend to a 100-mile radius from (1) the office where they worked at the time of their resignation and (2) the offices at which they worked, reported to, or had responsibilities over during the two years prior to their resignation; or "in the geographic areas where they assisted Aerotek in marketing its services in the two years prior to termination where such assistance involved customers over which Hadley/Curran had national or regional responsibilities." (Am. Compl. ¶ 39.)

2. The IIP Agreement

{25} The IIP Agreement contains several non-compete and non-solicitation provisions which condition payment of incentives under the IIP. For the thirty months following separation from Aerotek, IIP participants are prohibited from "either directly on his or her own behalf, or indirectly through any entity in, or on behalf of or with respect to which, the [employee] is an officer, director, trustee, shareholder, creditor, employee, partner or consultant":

(1) recruiting, employing and providing the services of scientific, telecommunications, engineering, automotive, technical, information technology, information systems, industrial, office support, financial support, accounting, legal, energy, aviation, environmental and/or other personnel on a temporary or permanent basis, providing information systems, information technology and telecommunications services, or any other lines of business that the Companies engage in . . . in which the Participant performed work or obtained knowledge and information during the two (2) year period preceding his or her Separation from Service, within a radius of two hundred fifty

(250) miles of the office in which the Participant last worked or any other office in which the Participant worked during the two (2) years preceding his or her Separation from Service, or as much thereof as a Court of competent jurisdiction deems reasonable;

(2)    [soliciting clients or customers of Allegis and its subsidiaries];

(3)    Approach[ing], contact[ing], solicit[ing] or induc[ing] any Regular Employee of the Companies:

        (a) to provide services to any individual, corporation or entity whose business is competitive with any of the Companies, or

        (b) to leave the employ of any of the Companies;

(4)    Approach[ing], contact[ing], solicit[ing] or induc[ing] any person who has been a Contract Employee within the two (2) year period prior to the date of the Employee's [resignation] . . . ;

(5)    In any way, solicit[ing], divert[ing] or tak[ing] away any staff, temporary personnel, trade, business, or good will from the Companies; solicit accounts or personnel which became known to the Participant through his or her employment with the Companies; influence or attempt to influence any of the Companies' customers or personnel not to do business with the Companies . . . ;

(6)    Us[ing], divulg[ing] or disclos[ing] proprietary, trade secret or confidential information of the Companies.

(Mem. in Supp. of Prelim. Inj. Ex. 6, at 4–6 ¶ 9 (emphasis added).)

{26}    The IIP Agreement defines the "Companies" as "Allegis Group, Inc. and its subsidiaries."  (Mem. in Supp. of Prelim. Inj. Ex. 6, at 1 ¶ 2(f).)


3.  <u>Comparing the IIP Agreement and the Employment Agreements</u>

{27}    Both the breadth and length of covenants differ between the IIP Agreement and the Employment Agreements.

{28}    First, the IIP Agreement prohibits participants from doing business in which the participant "performed work or obtained knowledge and information during the two (2) year period preceding his or her Separation from Service."  (Mem. in Supp. of Prelim. Inj. Ex. 6, at 4–6 ¶ 9.) The Employment Agreements prohibit separated employees only from doing business in which the participant actually "performed services during the two

years prior to the termination of his employment." (Am. Mem. in Supp. of Prelim. Inj. 11.)

{29} Second, the IIP Agreement extends the non-compete restrictions to 250 miles from the employee's last office or any office in which the employee worked in the two years prior to his or her separation. A factual dispute arose whether the PES-NC locations fall within the 250-mile radius. The court does not resolve that dispute at this time. The Employment Agreements contain either a 50-mile or 100-mile restriction. (Am. Mem. in Supp. of Prelim. Inj. 26–27.)

{30} Third, the IIP Agreement was executed with Allegis and extends to Aerotek and TEKsystems, while the Employment Agreements do not mention TEKsystems. *Compare* (Verified Compl. Ex. A, at 23–25 ¶ 3 (Curran's Employment Agreement non-compete provision) *with* (Mem. in Supp. of Prelim. Inj. Ex. 6, at 1 ¶ 2(f), 4 ¶ 9 (the IIP Agreement non-compete restriction)).

{31} Fourth, the IIP Agreement covenants other than the non-disclosure provisions are in force for 30 months from the date of separation, while those in the Employment Agreements expire after 18 months following separation. *Compare* (Verified Compl. Ex. A, at 23–25 ¶ 3 (Curran's Employment Agreement non-compete provision)) *with* (Mem. in Supp. of Prelim. Inj. Ex. 6, at 4–6 ¶ 9.)


C. Jordan's Alleged Plan

{32} Plaintiffs allege that within the thirty months following his resignation, and in violation of his IIP Agreement, Jordan implemented a plan to start and develop businesses which would compete with Aerotek and TEKsystems, and that in doing so Jordan seeks to obtain an unfair advantage by staffing his new businesses with the already-trained Former Employees and by soliciting business from Aerotek's and TEKsystems' clients by using the Former Employees' established relationships with those clients. (Am. Compl. ¶ 52.) Although Jordan

did not hire the Former Employees until after the non-solicitation and non-compete provisions of his IIP Agreement expired on August 21, 2011, Plaintiffs allege that he began soliciting them before that date. (Mem. in Supp. of Prelim. Inj. 8–9.) Specifically, Plaintiffs allege that Jordan had discussed "doing staffing" with Hadley as early as February 2010 and that Jordan e-mailed Hadley about relocating to Raleigh as early as September 28, 2010. (Am. Mem. in Supp. of Prelim. Inj. 8–9.) Plaintiffs further allege Jordan spoke to Curran about ZP in the summer of 2011. (Am. Mem. in Supp. of Prelim. Inj. 9.)

{33} Plaintiffs further contend that Jordan "coached" the Former Employees during the time he was soliciting them, and provided them with indemnification against potential legal expenses. (Am. Mem. in Supp. of Prelim. Inj. 10.) Plaintiffs assert that Jordan had the Former Employees resign on a staggered schedule, and had them "continue[ ] to work for Aerotek and avail themselves of access to its confidential business information and trade secrets for weeks and months after deciding they would resign." (Am. Mem. in Supp. of Prelim. Inj. 9–10, 16.) Furthermore, Plaintiffs allege, the Former Employees helped develop the Defendant Companies while still employed by Aerotek. (Am. Mem. in Supp. of Prelim. Inj. 10–11.) Plaintiffs highlight an event in November 2011, when Nicholas was still employed by Aerotek, at which he and Jordan discussed setting up a meeting with one of Aerotek's former clients, Lockheed Martin. Lockheed Martin has been a customer of the Corporate Defendants since that time. (Am. Mem. in Supp. of Prelim. Inj. 19–20.)

{34} Plaintiffs conclude that Jordan's acts induced the Former Employees to breach their own non-compete agreements with Aerotek, such that at least four out of the five Former Employees are violating the non-compete provisions in either their Employment Agreement or the IIP Agreement. (Am. Mem. in Supp. of Prelim. Inj. 11, 28–29.)

D.  Alleged Misappropriation of Trade Secrets and Confidential Information

{35}    Although Plaintiffs claim that some misappropriation has already occurred, in seeking injunctive relief Plaintiffs rely heavily on the doctrine of inevitable disclosure.  They contend that the nature of the business in which the Corporate Defendants are engaged makes it inevitable that the Former Employees will misuse Aerotek's and TEKsystems' trade secrets and confidential information during the course of their employment.  Plaintiffs point to evidence that Defendants have obtained both TEKsystems' Staffing Service Agreement and Allegis' Internal Employee Handbook and have slightly altered them for use by the Corporate Defendants.  (Am. Mem. in Supp. of Prelim. Inj. 16, 21.)  Defendants also possess TEKsystems' Authorized Federal Supply Service – IT Technology Schedule Price List and CAT-2 Scheduling Sheet.  (Am. Mem. in Supp. of Prelim. Inj. 16.)  Plaintiffs further contend that several of the Former Employees "used external storage devices to extract information from their company laptops before departing Aerotek."  (Am. Mem. in Supp. of Prelim. Inj. 17.)  Defendants contend that the documents are not, in fact, confidential, and information the Former Employees may have removed from computer systems was limited to personal information.

{36}    Plaintiffs further complain that several of the Former Employees who had already decided to leave their employment nonetheless attended meetings and training sessions where confidential information was disclosed.  In particular, Hadley, after deciding to resign, "set up a meeting with a top-level executive with Aerotek to discuss the company's direction."  (Am. Mem. in Supp. of Prelim. Inj. 16.)  The suggestion is that the sole purpose of attending the meetings under these circumstances was to unfairly access information to use for the Corporate Defendants' competitive benefit.


E.  The Causes of Action in the Amended Complaint

{37}    Plaintiffs present multiple claims in their Amended Complaint, and the claims vary as to which Plaintiff is asserting the claim and against which Defendants the claim is being asserted.  The claims are:

- Count I: Tortious Interference with Contract, brought by Allegis and Aerotek against ZP, PES, and Jordan;

- Count II: Misappropriation of Trade Secrets, brought by Aerotek and TEKsystems against ZP and PES;

- Count III: Unfair and Deceptive Trade Practices, brought by Aerotek and TEKsystems against ZP, PES, and Jordan;

- Count IV: Breach of Fiduciary Duties, brought by Aerotek against Curran and Nicholas; and

- Count V: Misappropriation of Trade Secrets, brought by Aerotek and TEKsystems against Jordan, Curran, and Nicholas.

{38} Plaintiffs alternatively ask the court to reform any covenant to the extent necessary to render it enforceable. (Am. Compl. ¶ 123.)

{39} Plaintiffs do not in this action assert breach of contract claims against the Former Employees. Separate contract actions are being pursued in Maryland.

{40} Defendants contend that their Motion to Dismiss must be granted as to the tortious interference claims because, even assuming a breach of any covenant by the Former Employees (which is denied), Jordan and the Corporate Defendants have a competitive privilege which insulates them from liability for tortious interference. (Defs.' Mem. in Supp. of Mot. to Dismiss Pls.' Am. Compl. 8–9.) Defendants contend the trade secrets claims must be dismissed because Plaintiffs have not demonstrated specific trade secrets, and do not allege facts adequate to invoke the doctrine of inevitable disclosure. (Defs.' Mem. in Supp. of Mot. to Dismiss Pls.' Am. Compl. 11–12.) Defendants indicate that the UDTPA claim must be dismissed because it depends on the other claims which should be dismissed, and that the fiduciary duty claim against Curran and Nicholas should be dismissed because there is no factual allegation adequate to impose a fiduciary duty upon them. (Defs.' Mem. in Supp. of Mot. to Dismiss Pls.' Am. Compl. 14–15.)

{41} In addition to their attack on the Amended Complaint as having failed to state a claim, Defendants contend that Plaintiffs have in any event failed in their burden of proof necessary to justify the entry of a preliminary injunction.

## IV. LEGAL STANDARDS

{42}     A preliminary injunction "is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759 (1983).  Issuance is proper only:

> (1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation.

*Id.* at 401, 302 S.E.2d at 759–60 (citations omitted) (emphasis in original).

{43}     On a motion to dismiss pursuant to Rule 12(b)(6), the court inquires "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008) (quoting *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)).  The motion may be granted either if the complaint fails to allege facts necessary for relief, or alleges facts which necessarily defeat the claim being pursued.  *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 40, 626 S.E.2d 315, 322 (2006).

## V. ANALYSIS

A.  Count I: Tortious Interference with Contract

{44}     To state a claim for tortious interference with a contract, a plaintiff must allege five elements:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Esposito v. Talbert & Bright, Inc.*, 181 N.C. App. 742, 745, 641 S.E.2d 695, 697 (2007).

{45}    A tortious interference claim will fail if "[t]he plaintiff's complaint reveals on its face . . . that the defendant was justified" in its conduct. *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988), *see also Sellers v. Morton*, 191 N.C. App. 75, 82, 661 S.E.2d 915, 921 ("A complainant must show that the defendant acted with malice and for a reason not reasonably related to the protection of a legitimate business interest of the defending party").  That is, the court examines the complaint to see whether it demonstrates that the defendant was "acting for a legitimate business purpose" or "in furtherance of [its] own interests and by means that are lawful." *Peoples Sec. Life Ins.*, 322 N.C. at 221, 367 S.E.2d at 650; *Sellers*, 191 N.C. App. at 82, 661 S.E.2d at 921.

{46}    While justification is often thought of in terms of an affirmative defense, North Carolina includes the lack of justification as a part of the elements of a *prima facie* case and therefore imposes a pleading burden on a plaintiff.  *See United Labs, Inc. v. Kuykendall*, 322 N.C. 643, 661–62, 370 S.E.2d 375, 387 (1988), *citing Childress v. Abeles*, 240 N.C. 667, 84 S.E.2d 176 (1954); *see also N.C.P.I. Civ. 807.00.*

{47}    However, a defendant which may otherwise have a competitor's privilege may face liability if it acts "with malice and for a reason not reasonably related to the protection of a legitimate business interest . . . ." *Smith v. Ford Motor Co.*, 289 N.C. 71, 94, 221 S.E.3d 282, 296 (1976); *see also Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 523, 586 S.E.2d 507, 510 (2003).  Generally, a finding of malice will turn upon evidence of the defendant's "bad motive." *See Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 317, 498 S.E.2d 841, 850 (1998).

{48}    Here, Plaintiffs claim that Aerotek and/or Allegis had valid contracts with the Former Employees with which ZP, PES, and Jordan interfered without justification.  Obligated to accept the allegations of the Amended Complaint as true for purposes of the Motion to Dismiss, the court assumes that the employment

agreements contain valid reasonable covenants.  The court further assumes, for purposes of the Motion to Dismiss the tortious interference claims, that there are allegations of a breach of the covenants adequate to withstand dismissal in the actions pending in Maryland.  In this case, the focus is on whether the Amended Complaint itself discloses a competitive privilege or the loss of such a privilege because of acts taken with malice.

{49}     For purposes of the Motion to Dismiss, the court concludes that the Amended Complaint includes allegations sufficient to withstand Rule 12(b)(6) and that adequate facts are alleged that Jordan, ZP, and PES acted with an improper purpose and in breach of direct contractual promises made by Jordan to Plaintiffs.  Clearly, Defendants contest whether Plaintiffs will be able to prove those allegations, but a Rule 12(b)(6) motion is not the vehicle to resolve such disputes.

{50}     The court's inquiry is more searching to determine whether Plaintiffs' proof to date is adequate to support a preliminary injunction based on a claim of tortious interference.  The court concludes that this claim, standing alone, does not support a preliminary injunction, but rather any such injunction must rest upon adequate demonstration of the risk of misappropriation of trade secret claims.  The court is even more guarded in approaching a request for injunction based on tortious interference where the person(s) alleged to have breached the underlying contract are not parties to the litigation, and another forum is available to consider an injunction against the contracting party.

B.  Counts II and V: Misappropriation of Trade Secrets

{51}     The North Carolina Trade Secrets Protection Act ("TSPA"), N.C. GEN STAT. §§ 66-152 (2013), *et seq.*, provides the owner of a trade secret with a private right of action against a party which has misappropriated that trade secret.  N.C. GEN. STAT. § 66-153.  To state a cause of action under the TSPA, "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur."  *Analog Devices, Inc. v.*

*Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003); *see also VisionAIR v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004). "[A] complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is 'insufficient to state a claim for misappropriation of trade secrets.'" *Washburn v. Yadkin Valley Bank & Trust Co.*, 190 N.C. App. 315, 327, 660 S.E.2d 577, 585–86 (2008) (citation omitted). More specifically, a general allegation that an employee "acquired knowledge of [the former employer's] business methods; clients, their specific requirements and needs; and other confidential information pertaining to [the employer's] business" is not adequate to state a TSPA claim. *Id.* at 327, 660 S.E.2d at 586.

{52}   An injunction is a recognized appropriate remedy where actual misappropriation is demonstrated, as the TSPA expressly recognizes that "actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action . . . ." N.C. GEN. STAT. § 66-154 (2013). However, North Carolina courts are reluctant to grant injunctive relief solely on the basis of threatened misappropriation without proof of actual misappropriation. *See Analog Devices, Inc.*, 157 N.C. App. at 470–71, 579 S.E.2d at 455.

{53}   Plaintiffs here contend that the facts demonstrate that misappropriation will necessarily occur, such that this court should apply the doctrine of "inevitable disclosure." It is less than clear as to how that doctrine is to be applied in North Carolina. The court in *Analog Devices* was invited to apply the doctrine to enjoin an employee leaving to join a competitor, but did not reach that issue squarely. 157 N.C. App. at 470, 579 S.E.2d at 454–55. The court clearly suggested, however, that should the doctrine be applied, it should be used only to limit the scope of an employee's new employment duties while not preventing any and all employment with the plaintiff's competitor. *Id.* at 470–71, 579 S.E.2d at 455.

{54}   The North Carolina Court of Appeals earlier declined an opportunity to apply the inevitable disclosure doctrine in *Travenol Laboratories, Inc. v. Turner*, 30

N.C. App. 686, 693–94, 228 S.E.2d 478, 484–85 (1976). In doing so, the court recognized that an injunction may be appropriate to limit an employee's unauthorized disclosure of trade secrets or confidential information, but only if proof of the likelihood of the employee's disclosure of the information is "high." *Id.* at 692, 579, S.E.2d at 483. The court indicated that ordinarily the mere fact that the employee works for a competitor will be inadequate to prove a likelihood of disclosure, recognizing that an employee is entitled to take his general knowledge and skills with him to his new employer. *Id.* at 694, 579 S.E.2d at 485.

{55}    The inevitable disclosure doctrine has received at least some recognition by the federal courts in the Fourth Circuit, and one decision of the Middle District of North Carolina reviewed *Travenol* and predicted that the North Carolina state courts will recognize the doctrine in appropriate circumstances. *Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1459 (M.D.N.C. 1996). However, the court cautioned that the trade secrets at risk would have to be clearly identified and there would have to be significant similarity between the companies as well as between the employee's position with the two companies. *Id.* at 1460.

{56}    In order to rule upon the Motion to Dismiss, the court need not resolve whether it should ultimately apply the doctrine. Plaintiffs have made factual allegations that there has already been misappropriation of protected information adequate to withstand 12(b)(6). As to the P.I. Motion, the court cannot conclude that Plaintiffs have to date shown an adequate factual predicate to justify issuing an injunction based on threatened inevitable disclosures. The Parties present clearly different constructions of the factual record. Plaintiffs urge that the Corporate Defendants are direct competitors and that Jordan's very plan concentrates on securing trade secrets and confidential information from the Former Employees. Defendants, on the other hand, argue that the Corporate Defendants do not compete with Plaintiffs, and it must follow that disclosure of protected information by the Former Employees is not inevitable, especially those who executed only Aerotek employment contracts because Aerotek is not engaged in the IT business.

{57}    On balance, upon a review of the entire record, the court concludes that Plaintiffs have adequately stated a claim for trade secret misappropriation to withstand a Rule 12(b)(6) motion, but that Plaintiffs have not presented evidence of misappropriation or threatened misappropriation sufficient to justify the court issuing a preliminary injunction.

C.  Count III: Unfair and Deceptive Trade Practices

{58}    If a violation of the TSPA otherwise is shown to be "in or affecting commerce" and the proximate cause of injury to the plaintiff, it is a violation of the UDTPA as well. *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 659, 670 S.E.2d 321, 329 (2009) ("A violation of the [TSPA] constitutes an unfair act or practice under [the UDTPA]"; Id.; *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172–73, 423 S.E.2d 324, 326 (1992) ("If the violation of the [TSPA] satisfies [the UDTPA's] three prong test, it would be a violation of [the UDTPA]").  Accordingly, the UDTPA claim of Count III survives Rule 12(b)(6) along with the trade secrets claims of Counts II and V.  *See also Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC 41, at *119 (N.C. Super. Ct. Nov. 3, 2011).

D.  Count IV: Breach of Fiduciary Duty

{59}    To state a claim for breach of fiduciary duty, a plaintiff must first establish the existence of a fiduciary relationship. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001).  A fiduciary relationship may arise when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . and in which there is confidence reposed on one side, and resulting domination and influence on the other." *Id.* at 651–52, 548 S.E.2d at 707–08 (emphasis in original omitted) (internal quotation marks omitted) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)).

{60}    The typical employer-employee relationship is usually insufficient to meet this standard. *Id.* at 652; *Sunbelt Rentals, Inc. v. Head & Engquist Equip.,*

*L.L.C.,* 2002 NCBC LEXIS 2, at *24 (N.C. Super. Ct. July 10, 2002). Basic management responsibilities and "substantial discretion with respect to the day-to-day, 'nuts and bolts' operation" do not rise to the level of domination and influence over the company that the fiduciary standard requires. *Id.* at *34; *see also Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 2012 N.C. App. LEXIS 1452, at *17–20 (2012) (upholding trial court's grant of summary judgment against plaintiff's breach of fiduciary duty claim because the court concluded that "any confidence that Plaintiff reposed in [the employee] consisted of nothing more than relying on him to competently perform his assigned duties" and "that [the employee] exercised little or no control over Plaintiff's overall operations . . . .").

{61}     Plaintiffs allege that Nicholas and Curran were high-ranking directors for Aerotek (Am. Compl. ¶ 109), and that their participation in Aerotek's IIP Agreement extended their employee roles at Aerotek "beyond mere managers . . . ." (Pls.' Resp. to Defs.' Mot. to Dismiss Pls.' Am. Compl. 10.) This allegation, however, does not establish that Nicholas or Curran were in any position to dominate or control Allegis' overall operations. The court does not read the North Carolina Supreme Court's decision in *Sara Lee Corp. v. Carter*, to provide otherwise. 351 N.C. 27, 519 S.E.2d 308, *reh'g denied,* 351 N.C. 191, 541 S.E.2d 716 (1999). Most certainly there was no fiduciary duty that would limit Curran's and Nicholas' right to terminate their own employment. *See Elliott v. Enka-Candler Fire & Rescue*, 2011 N.C. App. LEXIS 1373, 5–7, 713 S.E.2d 132,135 (2011).

{62}     In conclusion, even under the liberal standards of notice pleading, Plaintiffs have failed to state facts adequate to impose the imposition of a fiduciary duty upon Curran or Nicholas.

# VI.   CONCLUSION

{63}   For the foregoing reasons, the court concludes that Plaintiffs have alleged facts supporting Counts I, II, III and V of the Amended Complaint sufficient to withstand the Motion to Dismiss.  However, they have not pled facts adequate to support Count IV.

{64}   Plaintiffs have not to date demonstrated adequate facts to prove that they will likely succeed on the merits of their claims, that Defendants will inevitably disclose any trade secret or confidential information, or that Plaintiffs will suffer immediate and irreparable harm.  Further, the Former Employees' interests in pursuing employment present factors which countervail against Plaintiffs' request for preliminary injunctive relief.

{65}   Accordingly:

1.   Plaintiffs' Motion for Preliminary Injunction is DENIED;

2.   Defendants' Motion to Dismiss Count IV of the Amended Complaint is GRANTED;

3.   Defendants' Motion to Dismiss Counts I, II, III, and V of the Amended Complaint is DENIED;

4.   The court approves the Parties' Joint Case Management Report submitted on January 17, 2013, and adopts the timetables for discovery and motions listed in that report.  Upon request by either Party, the court will convene a status conference, but otherwise the requirement for a Case Management Conference pursuant to Business Court Rule 17 is suspended.

IT IS SO ORDERED, this the 25th day of February, 2013.