RCR Enters., LLC v. McCall, 2014 NCBC 68.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| DAVIDSON COUNTY | 14 CVS 3342 |

RCR ENTERPRISES, LLC,

       Plaintiff,

v.

       **ORDER AND OPINION**

MATTHEW McCALL,

       Defendant.

{1}    **THIS MATTER** is before the Court upon Plaintiff RCR Enterprises, LLC's ("Plaintiff") Motion for Temporary Restraining Order (the "Motion for TRO")[1] in the above-captioned case.

> *Womble Carlyle Sandridge & Rice, PLLC by John F. Morrow, Jr. and David Boaz for Plaintiff.*

> *Poyner Spruill LLP by Lee A. Spinks and Joshua B. Durham for Defendant.*

Bledsoe, Judge.

{2}    Having considered the Motion, the briefs, the affidavits,[2] and other documents filed in support of and in opposition to the Motion, and the arguments of counsel at the hearing held on December 16, 2014, the Court finds and concludes as follows:

---

[1] Plaintiff filed a Motion for Preliminary Injunction contemporaneously with its Motion for TRO. At Plaintiff's request, the Court will consider only the Motion for TRO at this time.

[2] Plaintiff submitted five affidavits in support of its Motion for TRO, including the affidavits of Richard Childress, owner of Plaintiff; Dr. Eric Warren, Plaintiff's Director of Competition; and Luke Lambert, the crew chief of Plaintiff's #31 NASCAR Sprint Cup Series team. Defendant also submitted five affidavits in opposition to Plaintiff's Motion for TRO, including the affidavits of Defendant; Max Jones, Managing Director for Chip Ganassi Racing; Harold Holly, Competition Director of GMS Racing; and Jeffrey Dickerson, managing member of Spire.

# I.

## PROCEDURAL HISTORY

{3} Plaintiff filed its Complaint against Defendant Matthew McCall ("Defendant") in Davidson County on November 26, 2014, alleging claims for breach of contract and misappropriation of trade secrets.

{4} Plaintiff subsequently filed its Motion for TRO on December 3, 2014.

{5} Defendant sought designation to the North Carolina Business Court on December 4, 2014. This case was designated and assigned to this Court that same day.

{6} The Davidson County Superior Court scheduled Plaintiff's Motion for TRO for hearing on December 8, 2014, but later declined to hear the Motion after this case was designated to the Business Court.

{7} On December 16, 2014, the Court held a hearing on the Motion for TRO. Both parties were represented by counsel at the hearing.

# II.

## FACTUAL BACKGROUND

{8} Plaintiff is a stock car racing organization that competes in professional events, including those managed by NASCAR. (Compl. ¶ 6.)

{9} In its Complaint, Plaintiff describes its alleged confidential, trade secret, and proprietary information as follows:

> [Plaintiff] has developed and compiled confidential proprietary, and trade secret information relating to the design, development, fabrication, assembly, simulation, and testing of high performance stock car engines, bodies, chassis, tires, and frames. [Plaintiff's] confidential proprietary and trade secret information includes without limitation [Plaintiff's] race simulation technology and methods of using same; race strategy software and methods of using same; real-time race data analysis capabilities; gear and axle lubrication products and methods for using same; vehicle dynamics simulation software and methods of using same; compilations of aerodynamic and body shape data, research and techniques; underbody aerodynamic devices; [Plaintiff's] at-track wireless network and its operational capabilities; sound analysis techniques and methods of using same; throttle body designs; and race car setups.

(*Id.* ¶ 8.)

{10} Defendant was employed by Plaintiff from December 13, 2010 until November 16, 2014, first as a race engineer on one of Plaintiff's NASCAR Camping World Truck Series teams and later as a race engineer on Plaintiff's #31 NASCAR Sprint Cup Series team (the "#31 Team"). (*Id.* ¶¶ 13–14.)

{11} On November 30, 2012, in consideration of Defendant's promotion to the #31 Team, the parties executed an employment contract (the "Employment Contract"), which provided for an employment term through and including December 31, 2015, and stated, in pertinent part, as follows:

> [i]n the event [Defendant] resigns employment during the term of this contract, [Defendant] shall, for a period of 12 months following his last day of employment with [Plaintiff], not be employed, or serve as consultant or independent contractor, in any capacity identical or similar to that in which he participated while employed by [Plaintiff], by or for a "Competitor" of [Plaintiff] where such Competitor participates or intends to participate in the NASCAR Sprint Cup Circuit during that 12-month period. "Competitor" shall be defined as any person or entity who shall prepare racing cars for entry in races in which NASCAR Sprint Cup points are awarded, as well as special events such as the Budweiser Shootout, or Sprint Open races; provided, however, that "Competitor" shall not include any person or entity which shall prepare racing vehicles only for ARCA, Nationwide, or any racing series other than NASCAR Sprint Cup and the special events described above, and which does not compete in the NASCAR Sprint Cup series or other defined special events directly or through a parent, subsidiary, affiliate, or other business combination.

(*Id.* ¶ 35, Ex. A.) The Employment Contract included a non-exclusive list of Competitors. (*Id.*, Ex. A.)

{12} The Employment Contract also contained two clauses requiring that Defendant "reveal or disclose nothing of the operation, methods, techniques, technology, or policies of Plaintiff to any third person . . ." and preventing Defendant from revealing, disclosing, using, or otherwise misappropriating Plaintiff's trade secret and/or proprietary information. (*Id.* ¶ 33, Ex. A.)

{13} The Employment Contract further provided that Defendant's salary for the 2013 season would be $115,000.00 and that any pay increases for the 2014 and 2015 seasons would be subject to negotiation.

{14} Defendant began performing his duties under the Employment Contract on November 30, 2012.

{15} On several occasions during the 2014 racing season, Defendant indicated to Plaintiff that he wished to work as a crew chief for a Sprint Cup team. (*Id.* ¶ 44.)

{16} Plaintiff informed Defendant in October 2014 that Plaintiff planned to promote Defendant to crew chief for one of Plaintiff's NASCAR Nationwide Series teams for the 2015 season. (*Id.*)[3]

{17} Defendant, however, advised Plaintiff on November 3, 2014 that he intended to terminate his employment with Plaintiff at the end of the 2014 racing season and seek employment with another NASCAR team. (*Id.* ¶ 45.)

{18} Defendant accordingly tendered his resignation letter to Plaintiff on November 7, 2014, stating that "he intended to resign from [Plaintiff] upon the conclusion of the final NASCAR Sprint Cup Series race of the season on November 16, 2014." (*Id.* ¶ 47, Ex. B.) Defendant honored his commitment to Plaintiff through the final race of the season and resigned from Plaintiff's employment on November 16, 2014.

{19} Two days later, on November 18, 2014, Defendant informed Plaintiff that he had accepted a position as crew chief with Chip Ganassi Racing with Felix Sabates, Inc.'s ("Ganassi") #1 NASCAR Sprint Cup Series team. (*Id.* ¶ 39.) That same day, Ganassi issued a press release announcing that it had hired Defendant as crew chief of Ganassi's #1 team. (*Id.* ¶ 41.) Ganassi is a direct competitor of Plaintiff in the NASCAR Sprint Cup Series and was listed as a "Competitor" in Defendant's Employment Contract. (*Id.* ¶ 40, Ex. A.)

---

[3] While the Sprint Cup Series is NASCAR's "most prestigious" series and is "viewed as the major league level" of NASCAR racing, the Nationwide Series is "the next most prestigious" series and is "viewed, to steal a baseball term, as the Triple-A of NASCAR." *See* NASCAR's Different Series, NASCAR (Dec. 18, 2014 11:56 AM), http://www.nascar.com/en_us/sprint-cup-series/nascar-nation/nascar-edu/nascar-basic/nascar-national-series-home-tracks.html.

{20} Plaintiff subsequently filed this action, alleging claims against Defendant for breach of contract and misappropriation of trade secrets. Plaintiff now seeks a temporary restraining order enjoining and restraining Defendant from working for Ganassi or any other Competitor and from disclosing or otherwise misappropriating Plaintiff's confidential, trade secret, and/or proprietary information.

### III.
### LEGAL STANDARD

{21} The purpose of an injunction "is ordinarily to preserve the *status quo* . . . [and i]ts issuance is a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) (quoting *State v. School*, 299 N.C. 351, 357–58, 261 S.E.2d 908, 913 (1980)). Moreover, a temporary restraining order is a "drastic" procedure that "operates within an emergency context which recognizes the need for swift action . . . ." *State ex rel. Gilchrist v. Hurley*, 48 N.C. App. 433, 448, 269 S.E.2d 646, 655 (1980); *see also Leonard E. Warner, Inc. v. Nissan Motor Corp.*, 66 N.C. App. 73, 76, 311 S.E.2d 1, 3 (1984) (observing that a temporary restraining order has been called an "extraordinary privilege").

{22} Our courts have made clear that immediate injunctive relief should only be issued:

> (1) if [Plaintiff] is able to show *likelihood* of success on the merits of [its] case and (2) [Plaintiff] is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of [Plaintiff's] rights during the course of litigation.

*A.E.P. Indus.*, 308 N.C. at 401, 302 S.E.2d at 759–60 (citations omitted) (emphasis in original); *see, e.g.*, 2 Wilson on North Carolina Civil Procedure, § 65-3 (explaining that a plaintiff's likelihood of success on the merits of his claims is a factor to be considered by the court in ruling on a motion for a temporary restraining order).

{23} Moreover, "[a] court of equity must weigh all relevant facts before resorting to the extraordinary remedy of an injunction." *Travenol Laboratories, Inc. v. Turner*, 30 N.C. App. 686, 694, 228 S.E.2d 478, 484 (1976). A trial court generally

"should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted . . . ." *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 16, 431 S.E.2d 828, 835 (1993) (citation and quotation omitted), overruled on other grounds by *Sharpe v. Worland*, 351 N.C. 159, 522 S.E.2d 577 (1999).

IV.

ANALYSIS

Breach of Non-Compete Clause

{24} Plaintiff argues that it is entitled to a temporary restraining order (i) based on Defendant's alleged violation of the noncompetition agreement by working for Ganassi in a position "identical or similar" to the position Defendant held with Plaintiff and (ii) because "it is inevitable that [Defendant] will use or disclose [Plaintiff's] confidential, proprietary, and trade secret information as part of his job responsibilities." (Pl.'s Br. Supp. Mot., p. 3.)[4]

{25} "To be enforceable a covenant not to compete must be (1) in writing; (2) reasonable as to time and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) designed to protect a legitimate business interest of the employer." *Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994).

{26} Moreover, "[c]ovenants not to compete between an employer and employee are not viewed favorably in modern law. To be valid, the restrictions on the employee's future employability by others must be no wider in scope than is necessary to protect the business of the employer. If a non-compete covenant is too broad to be a reasonable protection to the employer's business it will not be enforced. The courts will not rewrite a contract if it is too broad but will simply not

---

[4] Plaintiff's breach of contract claim is based on Plaintiff's contentions that (i) Defendant failed to honor the employment term of the Employment Contract, (ii) Defendant has used or disclosed Plaintiff's confidential, proprietary and trade secret information for the benefit of himself and Ganassi in violation of the confidentiality provision of the Employment Contract, and (iii) Defendant accepted a position with Ganassi that is identical or similar to the positions he had with [Plaintiff] in violation of the noncompetition agreement in the Employment Contract. (Compl. ¶ 64.) Plaintiff's misappropriation of trade secrets claim is premised on Defendant's alleged violation of N.C.G.S. § 66-152 et seq. (*Id.* ¶ 68–73.)

enforce it." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004).

{27} Defendant contends that Plaintiff's claim for violation of the noncompetition provision is not likely to succeed because the non-compete is facially invalid, and thus unenforceable, for three principal reasons: (i) Plaintiff cannot show a legitimate protectable interest, (ii) the scope of the restricted activities is overbroad, and (iii) the agreement is impermissibly vague and ambiguous. Defendant further contends that even if the non-compete is enforceable, Defendant has not violated its terms because his crew chief position at Ganassi is not "identical or similar to that which he participated while employed by [Plaintiff]." (Def.'s Resp. Br. Pl.'s Mot., p. 7–11.)

{28} The Court declines to address Defendant's arguments concerning the enforceability of the non-compete because the Court concludes that, assuming without deciding that the non-compete is enforceable as written and further assuming that the non-compete should properly be read as Plaintiff contends,[5] Plaintiff has nonetheless failed to show a likelihood of success on its claim that Defendant has breached the non-compete by accepting the crew chief position with Ganassi.

{29} Plaintiff points to the following evidence as principal support for its claim that Defendant's work as a race engineer for Plaintiff is "identical or similar to" the work he is performing or will perform as a crew chief at Ganassi: (i) "while at [Plaintiff], [Defendant] routinely performed the tasks of the crew chief (and complained about doing so)," (ii) Defendant "carried out the functions and duties of the crew chief at practices or tests when the crew chief was absent or otherwise unavailable," (iii) Defendant "formally served as the crew chief for [Plaintiff's] #31 Sprint Cup Series team during the 2013 Brickyard 400 race at Indianapolis Motor Speedway," (iv) Defendant worked closely with, met regularly with, shared

---

[5] At the hearing, Plaintiff's counsel argued that the language of the non-compete should be read to preclude Defendant from working for Ganassi in a position involving tasks that he "routinely" or "regularly" participated in while he was employed with Plaintiff.

information with, and routinely traveled with Plaintiff's crew chief, (v) "crew chief and race engineers function as a single unit that is responsible for preparation of races and maximizing car performance at those races," and (vi) Plaintiff sought to promote Defendant to crew chief of a Sprint Cup Series team prior to his resignation. (Pl.'s Br. Supp. Mot., p. 18–19.)

{30} Defendant's evidence in response, however, tends to show that (i) Defendant occasionally participated in activities outside the scope of a race engineer to help the #31 team but did not regularly perform the duties of crew chief, (ii) Defendant only served as crew chief at one practice session – at Daytona in 2013 when the #31 car ran only 10 laps – and for only one testing session – at Homestead when the crew chief was not available, (iii) Defendant formally served as crew chief for one race – the Brickyard 400 – but did so only under the direction and control of the crew chief who was suffering from an eye injury and who communicated all critical race decisions from a trailer where he was watching the race, (iv) many members of the race team, including the car chief, race engineers and others, had regular and sustained engagement with the crew chief on a daily basis, (v) Plaintiff's purported promotion of Defendant to crew chief of a Sprint Cup Series team was after Defendant announced his resignation from Plaintiff and Defendant did not assume the position, and (vi) as a crew chief at Ganassi, unlike Defendant's "participation" while he was employed with Plaintiff, Defendant has (a) significant supervisory responsibility – overseeing twenty personnel at each race venue and fifty or more personnel at the race shops, (b) important public responsibilities– serving as the face of the team with sponsors, the media and the public at large, (c) substantial decision-making responsibility – including the authority to make all race-related decisions and the burden of discipline by NASCAR for rules infractions by the team, (d) significant leadership responsibilities – including serving as the leader of the team with responsibility for assuring the team's competitive success in NASCAR races, and (e) Defendant will be paid a salary as a crew chief at Ganassi three times the amount of compensation he received from Plaintiff, an indicator

that Defendant will have a role at Ganassi that is fundamentally different from the role that he held with Plaintiff.

{31} After considering the evidence presented by the parties, the Court concludes that Plaintiff has not shown, at this time, a likelihood of success on its claim that by accepting a crew chief position with Ganassi, Defendant has become employed in a "capacity identical or similar to that in which he participated while employed by [Plaintiff]" and therefore has breached the Employment Contract.

<u>Breach of Confidentiality Provision</u>

{32} Plaintiff has not presented evidence at this time that Defendant has disclosed Plaintiff's confidential information or otherwise breached the confidentiality provision contained in the Employment Contract, and therefore, the Court concludes that Plaintiff is not entitled to a temporary restraining order on this basis. Indeed, the Court of Appeals' conclusion in *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 471, 579 S.E.2d 449, 455 (2003), applies equally on the current record here:

> [Defendants] have signed agreements not to divulge confidential information belonging to [plaintiff], [Defendants' new employer] has instructed them not to do so, and there is no evidence that any party to this litigation intends to induce them to breach their agreement. An injunction [will not] be issued to restrain one from doing that which he is not attempting to do.

(citations and quotations omitted).

<u>Misappropriation of Trade Secrets</u>

{33} The North Carolina Trade Secrets Misappropriation Act ("TSPA") prohibits "the acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1) (2014). A trade secret is

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that

a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

{34} "[A]ctual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon finding misappropriation . . . ." N.C.G.S. § 66-154(a) (2014). Plaintiff may establish actual or threatened misappropriation by introduction of "substantial evidence" that Defendant "[k]nows or should have known of the trade secret; and [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without" Plaintiff's express or implied consent. N.C.G.S. § 66-155 (2014).

{35} Before the Court may grant Plaintiff relief, Plaintiff "must identify a trade secret with sufficient particularity so as to enable [Defendant] to delineate that which he is accused of misappropriating and [the Court] to determine whether misappropriation has or is threatened to occur." *Analog*, 157 N.C. App. at 468, 579 S.E.2d at 453 (citations omitted); *Unimin Corp. v. Gallo*, 2014 NCBC 43 ¶ 35 (N.C. Super. Ct., Sept. 4, 2014), www.ncbusinesscourt.net/opinions/2014_NCBC_43.pdf (denying preliminary injunction).

{36} Plaintiff seeks a temporary restraining order, contending that Defendant should be enjoined from disclosing Plaintiff's trade secret information because Defendant has the opportunity to disclose Plaintiff's trade secret information as a crew chief for Ganassi and will inevitably disclose that information to Ganassi. Plaintiff does not bring forward evidence suggesting that Defendant has actually disclosed Plaintiff's confidential or proprietary information to Ganassi.

{37} As an initial matter, the Court notes that the doctrine of "inevitable disclosure" has not yet been firmly adopted by the North Carolina courts.

*See Analog*, 157 N.C. App. at 470, 579 S.E.2d at 454–55 (declining to apply doctrine and noting that "if the doctrine is applied as urged by [Analog], then no employee could ever work for its former employer's competitor on the theory that disclosure of confidential information is 'inevitable'"); *Allegis Grp., Inc. v. Zachary Piper LLC*, 2013 NCBC 13 ¶ 53 (N.C. Super. Ct., Feb. 25, 2013), www.ncbusinesscourt.net/opinions/2013_NCBC_13.pdf (denying motion for preliminary injunction).

{38}   Moreover, the Court is not prepared to apply the inevitable disclosure doctrine under the present circumstances given that Plaintiff has not brought forward evidence suggesting that Defendant has disclosed or will disclose Plaintiff's confidential information. To the contrary, Defendant's evidence tends to show that (i) Defendant is subject to the confidentiality provision in the Employment Contract and has not disclosed and does not intend to disclose Plaintiff's information, (ii) Ganassi has instructed Defendant not to disclose Plaintiff's confidential information, and (iii) in any event such information appears to be of limited use or relevance to Ganassi in light of Ganassi's own technology initiatives and the sweeping NASCAR rule changes that will be in effect for the upcoming 2015 season.

{39}   Additionally, Defendant has challenged the adequacy of Plaintiff's identification of its trade secrets, offering evidence tending to show that Plaintiff's claimed trade secrets involve public information or are otherwise a general listing of categories of information used and developed by any NASCAR race team.  Plaintiff points to the fact that Ganassi has objected on confidentiality grounds to Plaintiff's subpoena requesting Ganassi to produce documents relating to Ganassi's race engineer position as evidence that Defendant necessarily possesses confidential and trade secret information of Plaintiff and has further offered affidavits attesting to the confidential nature of the information Defendant was exposed to while employed with Plaintiff.

{40}   Based on the Court's review of the record and the parties' submissions at this time, the Court is not satisfied that Plaintiff has identified its claimed trade secrets with sufficient particularity to warrant the extraordinary relief requested.

Plaintiff has presented several affidavits purporting to describe its "proprietary technologies and data;" however, like the Plaintiffs in *Analog* and *Unimin*, Plaintiff has not brought forward evidence that explains why or how Plaintiff's methods and processes are unique so as to qualify as trade secrets under the TSPA. *See Analog*, 157 N.C. App. at 468, 579 S.E.2d at 453 (holding that the plaintiff had "asserted trade secrets at almost every stage in the production of [its] products but only offered general evidence in support of those assertions"); *see also Unimin*, 2014 NCBC 43 at ¶ 41 ("In like fashion here, Plaintiff broadly identifies various processes as its alleged trade secrets without offering evidence showing that those processes are unique to Plaintiff or have been modified by Plaintiff in unique ways.").

{41}   Further, Plaintiff has not brought forward evidence of specific actions that indicate that Defendant intends to disclose or use Plaintiff's alleged trade secret information that would compel the entry of immediate injunctive relief based on a threat of misappropriation. Such proof is frequently present when North Carolina courts elect to enjoin threatened misappropriation. *See, e.g., Horner Int'l Co. v. McKoy*, 754 S.E.2d 852, 854–60 (N.C. Ct. App. 2014) (defendant commenced work for a competitor shortly after sending trade secret information to defendant's personal email account); *Byrd's Lawn & Landscaping v. Smith*, 142 N.C. App. 371, 377, 542 S.E.2d 689, 693 (2001) (defendant immediately started his own business in competition with former employer after resigning and underbid former employer on eleven of fourteen projects); *Barker v. Gould*, 146 N.C. App. 561, 562, 553 S.E.2d 227, 228 (2001) (defendant made copies of plaintiff's customer, supplier and pricing lists and precise product formulations before resigning); *Armacell LLC v. Bostic*, 2010 N.C. App. LEXIS 1278, *32 (N.C. Ct. App., July 20, 2010) (unpublished) (defendant stole plaintiff's proprietary information using CD burning software and an external hard drive); *Allegis Grp.*, 2013 NCBC 13 at ¶ 52 (explaining that a court is less likely to grant injunctive relief "solely on the basis of threatened misappropriation without proof of actual misappropriation").

{42} Accordingly, for each of these reasons, the Court concludes that Plaintiff has not shown a likelihood of success on its misappropriation of trade secrets claim at this time.

Irreparable Harm

{43} In light of the Court's determination that Plaintiff has not shown a likelihood of success on the merits of either of its claims, Plaintiff cannot show at this stage that denial of a temporary restraining order will result in irreparable harm.

V.

CONCLUSION

{44} After balancing the equities and considering the potential harm to Plaintiff if a temporary restraining order is not issued and the potential harm to Defendant if the requested temporary injunctive relief is granted, and upon a review of the entire record before the Court at this time, the Court finds that Plaintiff has not presented sufficient evidence to show that it is likely that it will succeed on the merits of its claims, that Plaintiff will suffer irreparable harm if a temporary restraining order is not entered, or that the issuance of a temporary restraining order is necessary to protect Plaintiff's rights during the pendency of the litigation.

{45} **WHEREFORE**, the Court concludes that a temporary restraining order should not issue and hereby **DENIES** Plaintiff's Motion for Temporary Restraining Order.

**SO ORDERED**, this the 19th day of December 2014.