Unimin Corp. v. Gallo, 2014 NCBC 43.

STATE OF NORTH CAROLINA

MITCHELL COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 141

UNIMIN CORPORATION, a
Delaware corporation,

        Plaintiff,

v.

THOMAS GALLO, an individual, and
I-MINERALS USA, INC., an Idaho
corporation,

        Defendants.

ORDER AND OPINION ON
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
(REDACTED)

{1}    **THIS MATTER** is before the Court upon Plaintiff Unimin Corporation's ("Plaintiff") Motion for Preliminary Injunction (the "P.I. Motion") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure ("N.C.R.C.P."). Based on the P.I. Motion, briefs in support of and in opposition to the P.I. Motion, and the arguments of counsel at the August 26, 2014 hearing, the Court **DENIES** Plaintiff's P.I. Motion.[1]

*Moore & Van Allen, PLLC by Anthony T. Lathrop, E. Taylor Stukes, and Martha J. Efird for Plaintiff.*

*Erwin, Bishop, Capitano & Moss, P.A. by J. Daniel Bishop and Scott A. Hefner for Defendant Thomas Gallo.*

*The Van Winkle Law Firm by Larry McDevitt, David M. Wilkerson, and Heather W. Goldstein for Defendant I-Minerals USA, Incorporated.*

Bledsoe, Judge.

---

[1] To protect the alleged trade secret information of the parties, this Order and Opinion on Plaintiff's Motion for Preliminary Injunction has been redacted. An original, unredacted version of this Order and Opinion is filed under seal and is available, as necessary, for any appellate process.

## I.  INTRODUCTION

{2}     Plaintiff seeks injunctive and monetary relief against Defendants Thomas Gallo ("Defendant Gallo") and I-Minerals USA, Incorporated ("Defendant I-Minerals") (collectively, "Defendants").

{3}     Plaintiff and Defendant I-Minerals are in the business of mining and processing quartz and other minerals.[2]  Plaintiff alleges that Defendant I-Minerals hired Defendant Gallo, Plaintiff's former General Manager, Research and Development, in June 2014 with the intent to misappropriate Plaintiff's trade secrets and thereby compete with Plaintiff in the high purity quartz ("HPQ") market.  Plaintiff asserts causes of action against one or both Defendants in its Verified Complaint for violation of the North Carolina Trade Secrets Protection Act ("NCTSPA"), violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), breach of contract, conversion, unjust enrichment, breach of implied duties of good faith and fair dealing, and tortious interference with contract.

{4}     The question before the Court is whether Plaintiff has adequately demonstrated both a likelihood of success on its claims and irreparable harm sufficient to entitle it to a preliminary injunction enjoining Defendants from disclosing and using Plaintiff's confidential, proprietary, and/or trade secret information and Defendant Gallo from working for Defendant I-Minerals in HPQ development.

## II. PROCEDURAL HISTORY

{5}     Plaintiff filed its Verified Complaint in Mitchell County on July 28, 2014, accompanied by a Motion for Temporary Restraining Order and Preliminary Injunction ("Motion for TRO") and a Motion for Leave to Conduct Expedited Discovery ("Motion for Expedited Discovery").  The case was designated a mandatory complex business case on July 29, 2014, and assigned to the undersigned on July 31, 2014.

---

[2] Plaintiff competes on a worldwide basis and is a leading company in the mining, processing and sale of high purity quartz.  (Compl. ¶ 14.) Defendant I-Minerals is an early-stage company and currently has five employees. (Def. I-Minerals' Resp. to P.I. Motion, p. 3.)

{6}    All parties appeared before this Court on August 12, 2014 for a hearing on Plaintiff's Motion for TRO[3] and Motion for Expedited Discovery.  On August 13, 2014, the Court entered a Temporary Restraining Order ("TRO"), restraining and enjoining Defendant Gallo from disclosing certain information regarding Plaintiff's processes employed in producing HPQ and ordering Defendant Gallo to return all Plaintiff's documents and files containing such information to the extent such information remained in his possession or under his control.  *Unimin Corp. v. Gallo*, No. 14 CVS 141 ¶ 2 (N.C. Super. Ct. Aug. 13, 2014) ("TRO and Expedited Discovery Order").  The Court also set a schedule for expedited discovery and briefing in connection with Plaintiff's P.I. Motion.  *Id.* at ¶ 9.

{7}    The TRO and Expedited Discovery Order permitted the parties to serve upon one another written discovery requests and take the deposition of each party on an expedited basis.  The Order directed that all discovery be narrowly focused on the issues relevant to Plaintiff's P.I. Motion.

{8}    On August 19, 2014, the parties appeared before the Court for a hearing on the parties' objections to written discovery served pursuant to the TRO and Expedited Discovery Order.  At the hearing, each Defendant contended that Plaintiff had not properly answered that Defendant's interrogatories and had not made a full and complete production of documents in response to that Defendant's request for production of documents.

{9}    After considering the written discovery requests and responses of each party and the arguments of counsel at the hearing, the Court ordered Plaintiff to "identify with greater specificity the information Plaintiff contends constitutes confidential, proprietary and/or trade secret information as alleged in paragraph 40 of Plaintiff's Verified Complaint" and ordered that the identification be "sufficiently particular so that Defendants will be able to determine the information they are accused of misappropriating and the  Court will be able to determine whether

---

[3] Although Plaintiff filed its P.I. Motion and Motion for TRO in a single document, the Court did not consider Plaintiff's P.I. Motion at the August 12, 2014 hearing on Plaintiff's Motions for TRO and for Expedited Discovery.

misappropriation has occurred or is threatened to occur." The Court ordered Plaintiff to supplement this information on or before 5:00 P.M. on August 20, 2014. *Unimin Corp. v. Gallo*, No. 14 CVS 141 ¶ 1 (N.C. Super. Ct. August 20, 2014) (the "Order on Written Discovery Objections"). The Court also ordered Plaintiff to produce at the same time representative documents for each category of information Plaintiff claimed constituted its protectable confidential, proprietary and/or trade secret information. The Court specifically ordered that all such information and documents be produced as "Attorney's Eyes Only" information under the parties' consent protective order and thus not made available to any of the parties, but only to their counsel. In addition, the Court extended the TRO until September 4, 2014. *Id.*

{10} On August 22, 2014, Plaintiff emailed to each Defendant nineteen (19) pages of heavily redacted documents as well as supplemental interrogatory responses purporting to provide greater specificity of its confidential, proprietary and/or trade secret information consistent with the Court's Order.[4]

{11} All parties appeared before this Court on August 26, 2014 for a hearing on Plaintiff's P.I. Motion.[5]

---

[4] On August 21, Plaintiff reported to the Court that Plaintiff was not able to comply with the August 20 deadline in the Court's Order, citing the unavailability of Plaintiff's chief technical witness, who also served as Plaintiff's 30(b)(6) designee. Plaintiff made its required supplementation and production during the Plaintiff's 30(b)(6) deposition on August 22, and Defendants were thereafter able to examine Plaintiff's corporate designee concerning Plaintiff's supplemental discovery responses and production. Although the Court does not condone Plaintiff's failure to adhere to the Court's deadline, the Court recognizes that the expedited discovery schedule created difficult scheduling issues for all parties. Given that it does not appear that Defendants were unduly prejudiced by Plaintiff's delay, Defendants have not sought or advised that they intend to seek sanctions, and the Court's resolution of Plaintiff's P.I. Motion, the Court declines to sanction Plaintiff for its failure to make timely supplementation in this instance.

[5] In Plaintiff's P.I. Motion, brief in support of the P.I. Motion, Supplemental Brief in Support of the P.I. Motion, and at all times prior to the August 26, 2014 hearing, Plaintiff sought to enjoin Defendant Gallo from working in any capacity for Defendant I-Minerals in addition to enjoining Defendant Gallo's disclosure and use of Plaintiff's proprietary, confidential and/or trade secret information. At the hearing, however, Plaintiff retreated from this position and stated that in addition to a non-disclosure and non-use injunction, Plaintiff now seeks to enjoin Defendant Gallo from working for Defendant I-Minerals only in the HPQ area of its business.

## III. FACTUAL BACKGROUND

{12}   For purposes of the P.I. Motion, the Court "examines both the pleadings and additional evidence submitted to determine whether Plaintiff [has] satisfied its burden of securing preliminary injunctive relief." *Allegis Grp., Inc. v. Zachary Piper LLC*, 2013 NCBC 13 ¶ 8 (N.C. Super Ct. Feb. 25, 2013), www.ncbusinesscourt.net/opinions/2013_NCBC_13.pdf (denying the plaintiffs' motion for preliminary injunction).  All findings of fact and conclusions of law are solely for purposes of determining Plaintiff's P.I. Motion and do not become the law of the case.  *Id.*; *see, e.g., Schloss v. Jamison*, 258 N.C. 271, 276, 128 S.E.2d 590, 594 (1962) ("The findings of fact and other proceedings of the judge who hears the application for an interlocutory injunction are not binding on the parties at the trial on the merits."); *Childress v. Yadkin County*, 186 N.C. App. 30, 43, 650 S.E.2d 55, 64–65 (2007) ("[F]indings and conclusions made in the grant of an injunction are not authoritative as 'the law of the case' for any other purpose, and the judgment or order [is] not *res adjudicata* on final hearings.") (citations and quotation omitted).

A.   The Parties

{13}   Plaintiff is a Delaware corporation with its principal place of business in Connecticut.  Plaintiff mines and processes various minerals, including HPQ, glass grade feldspar, ceramic grade feldspar, filler grade feldspar and melting quartz in multiple locations, including four locations in Mitchell and Avery Counties in the North Carolina mountains.  (Pl.'s Suppl. Br. Supp. P.I. Mot., p. 3.)  Plaintiff mines and processes HPQ under the trade names Quartzil, Quintus, and Iota and sells its HPQ worldwide for use in a variety of industries, including the semiconductor manufacturing, quartz lighting, and fiber optic cable industries.  Plaintiff alleges that it is the global leader in HPQ and that its processes for creating Quintus and Iota quartz are confidential, proprietary, and/or trade secret.  (*Id.*, at p. 4.)  At the present time, the parties acknowledge that Iota-grade quartz is the highest purity quartz yet achieved (*i.e.*, "ultra-high purity" quartz) and is the industry standard.[6]

---

[6] Plaintiff does not consider Quintus to be high purity quartz. (Unimin Dep. 94:1-7, Aug. 22, 2014.)

{14}    Defendant Gallo was employed by Plaintiff from 1997 until February 2009, starting as Plaintiff's Senior Research Engineer and retiring as Plaintiff's General Manager, Research and Development.  (*Id.*, at p. 3.)  Plaintiff contends that Defendant Gallo was the "inventor or key player in the development of each step" of the trade secrets Plaintiff claims have been or are threatened to be misappropriated.  (Pl.'s Reply Mem., p. 6.)

{15}    During his time as Plaintiff's employee, Defendant Gallo executed three agreements: (1) a Confidentiality and Employment-at-Will Agreement on December 4, 1996 (the "1996 Agreement"); a Confidentiality Agreement on January 2, 1997 (the "1997 Agreement"); and a Settlement, Confidentiality, and Non-Compete Agreement on March 5, 2009 (the "2009 Agreement") (collectively, the "Agreements").

B.  The Agreements

{16}    The 1996 and 1997 Agreements were executed at the commencement of Defendant Gallo's employment.  The 2009 Agreement was executed in connection with Defendant Gallo's voluntary termination from employment.  Each Agreement contained non-disclosure provisions prohibiting Defendant Gallo from disclosing Plaintiff's confidential, proprietary, and/or trade secret information and materials. The 1996 Agreement contained a five-year, post-employment limitation on Defendant Gallo's non-disclosure obligations.  Neither the 1997 nor 2009 Agreement contained a time limitation on Defendant Gallo's non-disclosure agreement. (Compl., Exs. 1–3.)

{17}    The 2009 Agreement reaffirmed the 1996 and 1997 Agreements and provided that Defendant Gallo "fully and freely acknowledge[d] and agree[d] that [for purposes of his non-disclosure obligations], all of the specialized knowledge and information relating to High Purity Quartz in [his] possession and/or within his knowledge is confidential information belonging to [Plaintiff]."  (*Id.*, Ex. 3.)  The 2009 Agreement also contained an expansive non-competition covenant that precluded Defendant Gallo from working with any enterprise involved in the HPQ

business anywhere in the world for a period of five years.[7] All parties agree that the non-competition covenant in the 2009 Agreement expired on February 9, 2014 without a breach at any time by Defendant Gallo.

{18} The 1997 and 2009 Agreements each provide that the Agreement "shall be construed, governed by and enforced in accordance with the laws of the State of Connecticut." (*Id.*, Exs. 2–3.) The 1996 Agreement does not contain a choice of law provision. (*Id.*, Ex. 1.)

C. Defendant I-Minerals' Employment of Defendant Gallo

{19} Following the expiration of Defendant Gallo's non-compete period on February 9, 2014, Defendant Gallo began soliciting employment from various companies in the HPQ industry. (Pl.'s Suppl. Br. Supp. P.I. Mot., p. 6.) In that effort, Defendant Gallo contacted Quartz Corp., one of Plaintiff's competitors, and advised that he was "a ceramic engineer with a broad background including high purity quartz." (Gallo Dep., Aug. 21, 2014, Ex. 15.) In his communications with Quartz Corp. about potential employment, Defendant Gallo provided Quartz Corp. a list he created describing different pieces of Plaintiff's confidential information that he understood he could not disclose. The list included the following statements:

> Unimin has specific technology related to removing [REDACTED] from Quartz which is Unimin proprietary information. It is not believed this process was ever patented.

> Unimin has specific technology related to removing [REDACTED] from Quartz, aka Iota processing, which is Unimin proprietary information [sic] It is not believed this process was ever patented

> Unimin has specific technology related reactor designs, "Continuous Reactor System for Anoxic Purification." USP 7 837 955 Nov 23 2010 First Page Attached

---

[7] The non-competition provision specifically provided that for a period of five years after the termination of Defendant Gallo's employment, Defendant Gallo "will not directly or indirectly, manage, operate, control, participate in, accept employment or a consulting position with, or otherwise advise or assist or be connected with or directly or indirectly own or have any interest (except ownership of a less than one-half (1/2) of one percent (1%) of the outstanding shares of a publicly traded company) or right with respect to any enterprise which engages in the business of mining, producing, processing, testing and/or selling High Purity Quartz anywhere in the world."

(Compl., Ex. 3 ¶ 9.)

Unimin has confidential floatation technology belonging to [REDACTED], which Unimin is no longer entitled to use

Unimin has an extensive database on Quartz deposits and Quartz products from around the world

(Pl.'s Suppl. Br. Supp. P.I. Mot., p. 7.) Quartz Corp. reviewed the 2009 Agreement and determined that it could not "overcome the 'potential confidential info[rmation]' limitations that exist." (Gallo Dep., Ex. 15.)

{20} After Quartz Corp. declined to hire him, Defendant Gallo sent inquiries to other potential employers in which he highlighted his experience in HPQ. (Gallo Dep., Exs. 6, 11.) On May 2, 2014, Defendant Gallo contacted Defendant I-Minerals for possible employment and referenced his invention of and prior experience with Plaintiff's Iota-8 HPQ product. (I-Minerals Dep. 112–15, Aug. 20, 2014.) Soon thereafter, Defendant I-Minerals hired Defendant Gallo as a consultant. (Pl.'s Suppl. Br. Supp. P.I. Mot., p. 10; Compl., Ex. 4.)

{21} Defendant I-Minerals is one of Plaintiff's competitors in the HPQ markets. On July 10, 2014, Defendant I-Minerals published a news release that stated it was "closer to developing high purity quartz" and announced that Defendant I-Minerals had hired Defendant Gallo as a consultant "to oversee ceramic test work and market development." (Compl., Ex. 4.) The press release further proclaimed that "[w]ith the addition of Thomas Gallo to our team [Defendant I-Minerals is] better positioned to compete in the highly competitive quartz markets." (*Id.*)

{22} Plaintiff alleges that Defendant I-Minerals' sole purpose in hiring Defendant Gallo was to gain knowledge of Plaintiff's confidential, proprietary, and/or trade secret information so that it can produce quartz at Plaintiff's Iota-grade. Plaintiff further alleges that Defendant Gallo has and/or threatens to disclose this information to Defendant I-Minerals and points to Defendant I-Minerals' press release statements and recent production of Quintus-grade quartz, as well as Defendant Gallo's disclosures to Quartz Corp. and his repeated reference to his work with high purity quartz in seeking employment as evidence of this alleged actual and/or threatened misappropriation.

D.  Plaintiff's Description of its Trade Secret Information and Materials

{23}    All parties to this action are subject to a Consent Protective Order, whereby all documents filed in relation to Plaintiff's P.I. Motion were designated "Attorney's Eyes Only" and filed under seal.  Furthermore, upon request of the parties, the Court closed the courtroom pursuant to N.C.G.S. § 66-156 before commencing the hearing on Plaintiff's P.I. Motion to protect disclosure of any trade secret information of the parties.

{24}    In its Verified Complaint, Plaintiff claims trade secret protection is specifically warranted for the various processes Plaintiff utilizes in mining and producing HPQ, including:

> types of processes used, the sequence of the processes, the temperatures applied in certain processes, the composition and quantities of chemical agents applied in certain processes, the specialized materials used in certain processes, the design of the equipment used during certain processes, the duration of various processes, the speed of various processes, and the feed rate of various processes.

(Compl. ¶ 40.)

{25}    In its Supplemental Brief in Support of Plaintiff's P.I. Motion, Plaintiff lists its confidential, proprietary, and trade secret information as including the following:

> Unimin's "mining process control plan."  The "mining process control plan" uses [REDACTED].

> Unimin's mining techniques.  This includes the use of Unimin-designed [REDACTED].

> The specifications of Unimin's first stage processing.  This includes the specifications Unimin developed that are involved in [REDACTED].

> The specifications of Unimin's second-stage processing.  This includes the specifications Unimin developed for [REDACTED].

(Pl.'s Suppl. Br. Supp. P.I. Mot., p. 5.)

{26}    In response to the Court's Order on Written Discovery Objections, Plaintiff produced 19 pages of heavily redacted documents related to Plaintiff's processes in

developing HPQ. Plaintiff removed any word, phrase, or reference to any word or phrase from those documents that, in its 30(b)(6) designee's belief, constituted confidential, proprietary, and/or trade secret information. (*See* Def. Gallo's Resp. P.I. Mot., Ex. 5; Unimin Dep. 186:3–10.)

## IV. LEGAL STANDARD

{27} "A preliminary injunction . . . is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 227, 393 S.E.2d 854, 856 (1990) (quoting *Investors, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977)).

{28} A preliminary injunction should only be issued

> (1) if [Plaintiff] is able to show *likelihood* of success on the merits of [its] case and (2) [Plaintiff] is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of [Plaintiff's] rights during the course of litigation.

*A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759–60 (1983) (citations omitted) (emphasis in original).

{29} Our Supreme Court has further defined "irreparable injury" as not necessarily "beyond the possibility of repair or possible compensation in damages, but that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *Barrier v. Troutman*, 231 N.C. 47, 50, 55 S.E.2d 923, 925 (1949) (citations omitted). If irreparable injury is not shown, the preliminary injunction will be denied. *Telephone Co. v. Plastics, Inc.*, 287 N.C. 232, 236, 214 S.E.2d 49, 52 (1975); *see Coble Dairy v. State ex rel. Milk Comm'n*, 58 N.C. App. 213, 214, 292 S.E.2d 750, 751 (1982).

{30} Moreover, "[a] court of equity must weigh all relevant facts before resorting to the extraordinary remedy of an injunction." *Travenol Laboratories, Inc. v. Turner*, 30 N.C. App. 686, 694, 228 S.E.2d 478, 484 (1976). The burden is on the moving party to establish its right to a preliminary injunction, but the remedy

"should not be lightly granted." *GoRhinoGo, LLC v. Lewis*, 2011 NCBC 38 ¶ 29 (N.C. Super. Ct. Sept. 29, 2011), http://www.ncbusinesscourt.net/opinions/ 2011_NCBC_38%20.pdf (citations omitted); *Travenol Labs.*, 30 N.C. App. at 692, 228 S.E.2d at 483. A trial court generally "should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted . . . ." *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 16, 431 S.E.2d 828, 835 (1993) (citation and quotation omitted), overruled on other grounds by *Sharpe v. Worland*, 351 N.C. 159, 522 S.E.2d 577 (1999).

## V. ANALYSIS

### 1. Likelihood of Success on the Merits[8]

A. <u>Violation of NCTSPA</u>

{31} Under the NCTSPA, "actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon judgment finding misappropriation . . . ." N.C.G.S. § 66-154(a) (2014). Actual or threatened misappropriation may be established by the introduction of "substantial evidence" that a person against whom relief is sought "[k]nows or should have known of the trade secret; and [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent of the owner [of the trade secret]." N.C.G.S. § 66-155 (2014). A defendant may rebut an owner's claim of misappropriation by proving that the defendant acquired the owner's trade secret information through independent development or reverse engineering, or by proving that the owner's "trade secret" information was received from another person with a right to disclose the information or is generally known in the industry. N.C.G.S. §§ 66-155, 66-152 (2014).

{32} A trade secret is defined under the NCTSPA as:

---

[8] Although Plaintiff has alleged eight claims in its Verified Complaint, Plaintiff only argues a likelihood of success on the merits of four claims: (1) violation of NCTSPA, (2) violation of UDTPA, (3) breach of 1997 Agreement, and (4) breach of implied duties of good faith and fair dealing in the 1997 Agreement. The Court determines Plaintiff's P.I. Motion accordingly.

business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method technique, or process that

> a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

{33}  In determining whether processes or information are trade secrets, the North Carolina courts generally consider six factors:

> (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997) (citations omitted).  The factors overlap, and courts considering these factors do not always examine them separately and individually.  *SCR-Tech LLC v. Evonik Energy Servs. LLC*, 2011 NCBC 26 ¶41 (N.C. Super. Ct. Jul. 22, 2011), http://www.ncbusinesscourt.net/opinions/2011_NCBC_26.pdf.

{34}  Furthermore, in a trade secret misappropriation case, "an applicant for a preliminary injunction must do more than merely allege that irreparable injury will occur. The applicant is required to set out with particularity facts supporting such statements so the court can decide for itself if irreparable injury will occur.*" North Carolina Farm Partnership v. NCF Investments, LLC*, 163 N.C. App. 318, 323, 593 S.E.2d 126, 130 (2004) (citations and quotations omitted).

i. Whether Defendants Know or Should Know of Plaintiff's Alleged Trade Secrets

{35}    North Carolina law is clear that "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003) (citations omitted).  A preliminary injunction is appropriately denied when a plaintiff "fail[s] to 'present evidence of specific trade secrets and processes.'" *Id.* (quoting *FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995)).

{36}    Plaintiff contends that Plaintiff "uses trade secrets and confidential and proprietary information to produce high purity quartz from mine to finished product." (Pl.'s Suppl. Br. Supp. P.I. Mot., p. 4).  Plaintiff further asserts that Plaintiff's "confidential, proprietary, and trade secret information is used at every step from planning the mining, mining the ore, separating the quartz from the feldspar and mica, processing the quartz to Quintus quartz, and further processing Quintus quartz to Iota." (*Id.*)  Plaintiff has alleged its trade secrets more specifically in its Complaint (¶ 40), in its supplemental brief to this motion (Pl.'s Suppl. Br. Supp. P.I. Mot., p. 5), and in its written discovery responses (*see* ¶ 42 *infra*).

{37}    Defendants argue that Plaintiff has failed to describe its trade secrets with the level of particularity required under North Carolina law.  Defendants contend, in particular, that each process Plaintiff identifies as a trade secret is a "standard element of the mining process utilized widely throughout the mining industry" and that Plaintiff has failed to identify with particularity any processes or variations to these processes that are unique to Plaintiff. (Def. I-Minerals' Resp. P.I. Mot., p. 7.) For their support, Defendants principally rely on the North Carolina Court of Appeals' decision in *Analog Devices*, *supra*, and an opinion from the United States District Court for the Western District of North Carolina, *FMC Corp.*, *supra*.

{38}    Plaintiff contends in response that it has sufficiently identified its alleged trade secrets under applicable law and points to a recent decision from the North Carolina Court of Appeals, *Horner Int'l. Co. v. McKoy,* 754 S.E.2d 852 (N.C. Ct.

App. 2014), as well as the Court of Appeals' earlier decision in *Barr-Mullin, Inc. v. Browning*, 108 N.C. App. 590, 424 S.E.2d 226 (1993), as its primary support.

{39}    The Court has carefully reviewed *Analog*, *FMC Corp.*, *Horner*, *Barr-Mullin* and other relevant case law and concludes that at this stage of the proceedings Plaintiff has not identified its alleged trade secrets with sufficient particularity under North Carolina law to enable Defendants to delineate that which they are accused of misappropriating and this Court to determine whether misappropriation has or is threatened to occur for purposes of issuing injunctive relief. *See generally Analog*, 157 N.C. App. at 468, 579 S.E.2d at 453.

{40}    In particular, like the plaintiff in *Analog*, Plaintiff has "asserted trade secrets at almost every stage in the production of [its] products but only offered general evidence in support of those assertions." *Id.* For example, the plaintiff in Analog defined its alleged trade secrets as follows:

> The circuit designs and solutions developed by Analog Devices . . .
>
> While each of Analog's designs and solutions, along with their specific implementations . . . may contain individual trade secrets, "it's a combination of all of the aspects which constitute trade secrets that make the device itself a trade secret."
>
> . . .
>
> "The techniques and the variations and the adjustments that are required to make . . . successful components . . . ."
>
> . . .
>
> Trade secrets can be found in the overall design and implementation of Analog's 94 xx products, even if all the constituent parts of that design were publicly known.

*Analog*, 157 N.C. App. at 469, 579 S.E.2d at 454.

{41}    In like fashion here, Plaintiff broadly identifies various processes as its alleged trade secrets without offering evidence showing that those processes are unique to Plaintiff or have been modified by Plaintiff in unique ways. For example, Plaintiff describes its "mining process control plan" as using "[REDACTED] modeling and process simulations" that develop "mineral processing strategies" but does not offer evidence explaining what those simulations and strategies are or why

those simulations and strategies are unique to Plaintiff. Similarly, Plaintiff describes its "mining techniques" as using various materials, equipment and other items designed or developed by Plaintiff, without offering evidence of what those materials, equipment or items are or how they are unique to Plaintiff. The same is true of Plaintiff's description of its first and second stage processing. In its description of each, Plaintiff describes its alleged trade secrets as involving specifications that Plaintiff developed for various processes, which again are not identified or shown by proof to be unique, as well as more general descriptions – for example, "further processing at [REDACTED] temperatures with [REDACTED] of various combinations and concentration" – that are not sufficiently particular to put Defendants on notice of what Plaintiff's alleged trade secrets are and to allow the Court to determine whether misappropriation has occurred. *See, e.g., FMC*, 899 F. Supp. at 1481 (denying preliminary injunction for violation of NCTSPA where plaintiff failed to "come forward with evidence establishing the precise nature of its trade secrets"); *Patch Rubber Co. v. Toelke*, 2013 U.S. Dist. LEXIS 84104, *13 (E.D.N.C. 2013) (denying preliminary injunction where plaintiff failed to demonstrate "what, if anything, in its strategic plan, formula or customer cost information is deserving of trade secret protection").

{42}    Although Plaintiff argues that it has "produced eight single-spaced pages of highly detailed identification of [Plaintiff's] processes, and the constituent parts of those processes [Plaintiff] claims to be trade secrets" in its supplemental interrogatory responses (Pl.'s Reply Mem., p. 6), the actual descriptions are again broadly stated and lack particularity. For example, to describe its claimed trade secret in the sequence of Plaintiff's processes, Plaintiff identifies "the following processes in various sequences," without identifying each sequence that Plaintiff contends is a trade secret or offering evidence explaining why that sequence is unique to Plaintiff. Similarly, to describe its claimed trade secret in "the temperature applied in these processes," Plaintiff states that "the various temperatures used at particular stages in the processes, which varies from process to process and depending on the high purity quartz product are the result of

[Plaintiff's] robust research and development program and is unique in the industry" but nowhere identifies what the temperatures are that Plaintiffs claim are trade secrets or shows (rather than declares) that the use of these temperatures is unique to Plaintiff. Along these same lines, to describe its claimed trade secret in "the design of the equipment used in these processes," Plaintiff states that the design of the equipment "includes equipment specifically modified by [Plaintiff] for particular purposes in [Plaintiff's] unique, proprietary process after it is delivered to [Plaintiff] by the manufacturer" but once again does not provide any specific detail concerning Plaintiff's alleged modifications to the equipment, the process it employs after receipt from the manufacturer, or evidence showing that Plaintiff's process is unique or proprietary. The rest of Plaintiff's supplemental interrogatory responses are to similar effect.[9] *See, e.g., Aeroflow, Inc. v. Arias*, 2011 NCBC 20 ¶¶ 43–45 (N.C. Super. Ct. Jul. 4, 2011), www.ncbusinesscourt.net/opinions/2011_NCBC_20.pdf ("[A]llegations that . . . items may be found as trade secrets does not constitute adequate proof that they are, in fact, trade secrets.").

{43}     Plaintiff contends that its identification of its alleged trade secrets are nevertheless sufficient when compared to the trade secret identifications recently found sufficient in *Horner*.  In that case, the Court of Appeals found the trade secrets described in the findings of fact and conclusions of law in the trial court's preliminary injunction to be sufficiently specific under North Carolina law.  *Horner*, 754 S.E.2d at 861.  The Court of Appeals asserted that "the verified amendment to [p]laintiff's complaint alleges with great detail and specificity the information

---

[9] As noted previously, Plaintiff also provided nineteen pages of heavily redacted documents that it argues related to the categories of each trade secret it claims. Despite the "Attorney's Eyes Only" restriction on the disclosure of these documents and the fact that Plaintiff bears the burden of coming forward with specific identification of information it claims is worthy of trade secret protection, *Analog*, 157 N.C. App. at 469, 579 S.E.2d at 454, Plaintiff's 30(b)(6) designee testified that he redacted the documents to remove references to Plaintiff's trade secret information because he was "concerned that they contained trade secrets that could eventually be disclosed regardless of whatever criteria of confidentiality was imposed in this hearing." (Unimin Dep. 186:3–10.) The Court agrees with Defendants that the redacted documents do not assist Defendants or the Court in ascertaining a specific identification of Plaintiff's alleged trade secrets.

[d]efendant has allegedly provided to his new employer, describing, *inter alia*, various raw materials and raw materials treatments; extraction, filtration, separation and distillation techniques; and methods for compounding of flavors, packaging and plant utility" and further that "these processes and methods were used in the production of flavor materials derived from seven specifically identified substances, such as cocoa, ginseng and chamomile." *Id.*, 754 S.E.2d at 859.

{44}    This Court, however, does not find *Horner* controlling for the purposes of Plaintiff's P.I. Motion.  The defendant in *Horner* was plaintiff's former plant manager, and in that role had "drafted, revised, and maintained records, including standard operating procedures, which described in detail each of the steps to be taken in producing the various products [of plaintiff]," all of which the trial court concluded were and contained plaintiff's trade secrets. The defendant thereafter resigned from plaintiff's employment, immediately joined plaintiff's competitor, and began to install, maintain and optimize the competitor's equipment in connection with the competitor's expansion and production of new products in competition with plaintiff using documents he had removed from plaintiff's offices prior to his departure.  *Horner*, Record on Appeal, at 93–94.[10]  By his own conduct, therefore, the defendant provided ample evidence of his knowledge of the specific information the plaintiff claimed to be a trade secret, and, in that context, the plaintiff's specific identifications enabled the defendant to "delineate that which he [was] accused of misappropriating." *Analog Devices, Inc.*, 157 N.C. App. at 468, 579 S.E.2d at 453.

{45}    In sharp contrast, the evidence of record in this case shows that Defendant Gallo has not worked for Plaintiff, with Plaintiff's alleged trade secrets, or in the HPQ industry for over five years, has not taken from Plaintiff any documents or other materials containing Plaintiff's alleged trade secret information, and has not otherwise evidenced an intent to use Plaintiff's alleged trade secrets.   Based on the facts and circumstances of this case, the trade secret identification offered by

---

[10] The Court of Appeals' decision in *Horner* does not contain the trial court's findings of fact and conclusions of law, but the record on appeal in the case may be accessed at the Court of Appeals' website (www.ncappellatecourts.org).

Plaintiff at this stage is not sufficient to put Defendants on notice of the information they are accused of misappropriating. *Horner*, 754 S.E.2d at 860–61 (quoting *Travenol Labs.*, 30 N.C. App. 694-95, 228 S.E.2d at 485) ("[T]he facts and circumstances of each case dictate the propriety of injunctive relief.").

{46} As a result, the Court concludes that Plaintiff here, like the plaintiff in *Analog*, has not provided a sufficient description of the alleged trade secrets at issue to provide Defendants sufficient notice of those trade secrets and instead has "invite[d] this Court to acknowledge the existence of trade secrets in the submitted information without bearing the burden of identifying those trade secrets." *Analog*, 157 N.C. App. at 469, 579 S.E.2d at 454.

{47} Like the Court of Appeals in *Analog*, this Court "will not read into [Plaintiff's] claims specific identification of [Plaintiff's confidential information] when it is [Plaintiff's] burden to come forward with evidence of [such information]." *Id.*; *see, e.g., Washburn v. Yadkin Valley Bank and Trust Company*, 190 N.C. App. 315, 327. 660 S.E.2d 577, 586 (2008) (denying preliminary injunction where defendant alleged statements such as "[the plaintiffs] 'acquired knowledge of [the defendant's] business methods; clients, their specific requirements and needs; and other confidential information pertaining to [the defendant's] business'"); *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 511, 606 S.E.2d 359, 364 (2004) (denying preliminary injunction where plaintiff alleged trade secrets by "broad product and technology categories" with "sweeping and conclusory statements").

{48} In addition, Defendants have brought forward evidence suggesting that at least some of Plaintiff's claimed proprietary information is not a trade secret under the NCTSPA and that Defendant I-Minerals independently developed Quintus-grade quartz before its relationship with Defendant Gallo began. (Def. I-Minerals' Resp. P.I. Mot., p. 8–12, Ex. E; Gallo Aff. ¶ 7); *see* N.C.G.S. § 66-155 (noting independent development is a defense to a misappropriation claim). For example, Defendant I-Minerals has brought forward evidence suggesting that the process for purifying quartz is generally known in the industry, and that, in particular, the floatation process, the design and use of rock crushing equipment, the technique of

magnetic separation, the process of gassing or hot chlorination, proper gassing temperatures and the process of electrodynamic comminution are all generally known in the mining (and HPQ) industry. (Def. I-Minerals' Resp. P.I. Mot., p. 8–12, Ex. E; Gallo Aff. ¶ 7.) Plaintiff's failure to show its specific, unique modifications to these well-known processes or techniques either unfairly deprives Defendants of an opportunity to rebut Plaintiff's claim of trade secret protection or suggests that Plaintiff's claim for trade secret protection of this information is not well-founded or both. Defendants' evidence raises further doubt about Plaintiff's ability to show that it has a protectable trade secret in this information and cuts against Plaintiff's claim that it can show a likelihood of success on the merits. *See N.C. Farm P'ship.*, 163 N.C. App. at 322, 593 S.E.2d at 129 (denying injunction where plaintiff failed to show "existence of a trade secret").

{49}    Further, Defendant Gallo has acknowledged that he recalls certain confidential information of Plaintiff relating to Plaintiff's mining and processes used to create Iota 8 and 9 level high purity quartz. (Def. Gallo's Mem. Opp. P.I. Mot., p. 7–8.) At this stage of the proceedings, however, Plaintiff has not brought forward sufficient evidence to enable the Court to identify any specific trade secrets involved in the mining and development of Iota 8 or 9 level HPQ or the specific information that Plaintiff seeks to protect in connection with the creation of these products. In any event, even if the Court were able to identify Plaintiff's alleged trade secrets sufficiently to craft an appropriate injunction tailored to protect Plaintiff's legitimate trade secrets at this time, as noted below, Plaintiff has failed to show actual or threatened misappropriation or use sufficient to justify the extraordinary measure of a preliminary injunction on the current record.

{50}    Accordingly, based on the evidence before the Court and for purposes of this P.I. Motion only, the Court finds that Plaintiff has not identified its alleged trade secrets with the level of specificity required to enable Defendants to delineate that which they are accused of misappropriating and the Court to determine whether misappropriation has or is threatened to occur. *Analog*, 157 N.C. App. at 469, 579 S.E.2d at 454.

ii. Actual or Threatened Misappropriation

{51}    A preliminary injunction is an appropriate remedy "where actual misappropriation is demonstrated," but a court is less likely to grant injunctive relief "solely on the basis of threatened misappropriation without proof of actual misappropriation." *Allegis Grp.*, 2013 NCBC 13 at ¶ 52 (citing *Analog Devices*, 157 N.C. App. at 470–71, 579 S.E.2d at 455). "[O]rdinarily the mere fact that the employee works for a competitor will be inadequate to prove a likelihood of disclosure." *Id.* at ¶ 54. "An injunction will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of a party . . . [n]or will an injunction be issued to restrain one from doing that which he is not attempting to do." *Travenol Labs.*, 30 N.C. App. at 696, 228 S.E.2d at 486.

1.  Actual Misappropriation and Use

{52}    For its proof of Defendants' actual misappropriation and use, Plaintiff relies on the list Defendant Gallo compiled while seeking employment with Quartz Corp., contending that Gallo improperly revealed to Quartz Corp. that Plaintiff removed **[REDACTED]** and **[REDACTED]** as part of its process to create Iota-grade HPQ.  Defendants, however, present evidence from public sources that removal of **[REDACTED]** and **[REDACTED]** from ore is an industry-wide practice and is necessary to create any form of HPQ.  (Def. I-Minerals' Reply to Pl.'s Suppl. Br. Supp. P.I. Mot., Exs. A–B.)  Accordingly, the Court concludes that Plaintiff's evidence is insufficient at this stage to show that Defendant Gallo has actually misappropriated and used Plaintiff's alleged trade secret information.

2.  Threatened Misappropriation and Use

{53}    Plaintiff contends that Defendant Gallo has had a specific opportunity to acquire or use Plaintiff's alleged trade secrets without its consent and therefore should be enjoined.  *Horner*, 754 S.E.2d at 860–61 (entering preliminary injunction where "[d]efendant's knowledge of trade secrets and opportunity to use those in his work for his new employer create a threat of misappropriation"); *see* N.C.G.S. § 65-155 (establishing misappropriation if defendant "knows or should have known of the trade secret" and "had a specific opportunity to acquire the trade secret for

disclosure or use"); *see also* N.C.G.S. § 66-154(a) (permitting preliminary injunction for actual or threatened misappropriation).

{54}    In particular, Plaintiff claims that because Defendant I-Minerals has already produced Quintus-grade quartz, the only rational reason Defendant I-Minerals could have for hiring Defendant Gallo is to acquire and use Plaintiff's confidential, proprietary and/or trade secret information from Defendant Gallo so it can produce the higher purity, Iota-grade quartz.  For evidentiary support, Plaintiff points to, in addition to Defendant Gallo's email exchange with Quartz Corp., (i) the acknowledgements in Defendant Gallo's 2009 Agreement that "all of the specialized knowledge and information relating to High Purity Quartz in Gallo's possession and/or within his knowledge is confidential information belonging to [Plaintiff], (ii) Defendant Gallo's  repeated representations to potential employers in his job search that he has a background in HPQ and Iota-grade quartz production, (iii) the statements in Defendant I-Minerals' press release indicating that with the addition of Defendant Gallo, Defendant I-Minerals is "better positioned to compete in the highly competitive quartz markets," and (iv) the deposition statements of Defendant I-Minerals' CEO that the company plans to "set its sights higher than Quintus" and produce the highest grade quartz it can. (Pl.'s Reply Mem., p. 2–3.)

{55}    In opposition, Defendants principally contend that (i) Plaintiff's alleged trade secret information is "of no use" or is "mostly irrelevant" to Defendants because Plaintiff's HPQ is mined and processed from a different ore than the ore mined and processed by Defendant I-Minerals, (ii) Defendant I-Minerals has independently developed Quintus-grade quartz and has no need for Plaintiff's alleged trade secret information for further development of its HPQ, (iii) Defendant Gallo has not engaged in any conduct that shows he is a threat to disclose and use Plaintiff's alleged trade secret information, and (iv) there is no basis in fact or law to assume Defendant Gallo will "inevitably disclose" Plaintiff's alleged trade secrets. (*See* Defs.' various briefs.)

{56}    It is undisputed that Plaintiff's Spruce Pine mines in North Carolina contain different, **[REDACTED]** ore than Defendant I-Minerals' Helmer Bovill mine

in Idaho. Defendants present testimony that the degree of quartz purity that can be achieved, and the processes employed to achieve it, are entirely dependent on the qualities of the raw ore product. (I-Minerals Dep. 46:16–48:13; 56:5–18.) Moreover, Defendant Gallo testified by affidavit that Plaintiff's Spruce Pine mine "produces the highest purity quartz in the world that is produced on a commercial scale" and that Plaintiff "has a monopoly on this market." (Gallo Aff. ¶ 7.) Therefore, according to Defendants, even if Defendant Gallo were to disclose and Defendant I-Minerals were to possess Plaintiff's alleged trade secret information, that information would be of little or no use to Defendant I-Minerals in producing HPQ. Relying on *Analog*, Defendants claim Plaintiff thus cannot show a threat of misappropriation. *Analog*, 157 N.C. App. at 470, 579 S.E.2d at 454 (denying trade secret protection where the alleged trade secrets were "process dependent so as to preclude misappropriation"). Plaintiff counters by arguing that its alleged trade secrets are transferrable, and while acknowledging that "all parts of the process depend upon the ore blend" that is mined (Unimin Dep. 53:20–23), contends that "[r]egardless of the process a competitor may use to initially purify quartz to high levels, [Plaintiff's] processes can be used to purify I-Minerals' quartz to the highest of quality within the industry while short-cutting years of expensive research and development." (Pl.'s Suppl. Br. Supp. P.I. Mot., p. 18.)

{57}    Upon a review of the evidence of record at this stage of the proceedings, the Court concludes that Plaintiff has not carried its burden to show through substantial evidence that Defendants have had a "specific opportunity to acquire [Plaintiff's alleged trade secrets] for disclosure or use." N.C.G.S. § 66-155. In particular, the evidence of record to date tends to show that, like the trade secrets alleged in *Analog* and in contrast to those alleged in *Horner*, the differences in the qualities of Plaintiff's North Carolina ore and Defendant I-Minerals' Idaho ore appear to require sufficiently different processes to mine and develop HPQ to render at least some, if not all, of Plaintiff's alleged trade secrets non-transferable. As such, Plaintiff has failed to show at this stage through substantial evidence that Defendants have had the "specific opportunity" to disclose or use Plaintiff's alleged

trade secrets that is required under North Carolina law.  *See Analog*, 157 N.C. App. at 465–70, 579 S.E.2d at 451–54 (denying preliminary injunction where trade secrets at issue were "heavily process dependent" and thus "mostly irrelevant" and of "no use" to defendant); *see also Horner*, 754 S.E.2d at 854–60 (issuing preliminary injunction and distinguishing *Analog* where there were "no product design differences which render 'non-transferable' the trade secrets of [the plaintiff] which [the defendant] possesses").

{58}    Moreover, Plaintiff has not brought forward evidence of specific actions which indicate that Defendants intend to disclose or use Plaintiff's alleged trade secret information sufficient to justify the entry of preliminary injunctive relief based on a threat of misappropriation.  Such proof has frequently been present when North Carolina courts have elected to enjoin threatened misappropriation. *See, e.g., Horner*, 754 S.E.2d at 854–60 (defendant commenced work for a competitor immediately after resigning and shortly after sending trade secret information to defendant's personal email account); *Byrd's Lawn & Landscaping v. Smith*, 142 N.C. App. 371, 377, 542 S.E.2d 689, 693 (2001) (defendant immediately started his own business in competition with former employer after resigning and underbid former employer on eleven of fourteen projects); *Barker v. Gould*, 146 N.C. App. 561, 562, 553 S.E.2d 227, 228 (2001) (defendant made copies of plaintiff's customer, supplier and pricing lists and precise product formulations before resigning); *Armacell LLC v. Bostic*, 2010 N.C. App. LEXIS 1278, *32 (2010) (unpublished) (defendant stole plaintiff's proprietary information using CD burning software and an external hard drive); *Allegis Grp.*, 2013 NCBC 13 ¶ 52 (a court is less likely to grant injunctive relief "solely on the basis of threatened misappropriation without proof of actual misappropriation").

{59}    Here, it appears beyond doubt that Defendant Gallo has maintained in confidence Plaintiff's alleged trade secret information since he left Plaintiff's employment in February 2009, now five and one-half years ago.  It is equally uncontroverted that he did not violate the terms of his non-competition covenant during its five-year term and did not work in the HPQ industry from February 2009

until he became a consultant for Defendant I-Minerals on June 1, 2014. Accordingly, Defendant Gallo's prior, long-term adherence to his contractual obligations is persuasive evidence that he is not a threat to violate his contractual or other legal commitments to Plaintiff and disclose Plaintiff's alleged trade secrets hereafter. *See, e.g., Aeroflow,* 2011 NCBC 20 ¶ 40 ("An injunction will not be issued simply to appease a groundless apprehension on the part of a plaintiff.").

{60} Moreover, the fact that Defendant Gallo sought employment from various employers by referencing his prior work history and experience appears unremarkable, particularly given that he had been out of the HPQ industry for five years and was no longer subject to a non-competition restriction. The evidence is undisputed at this stage that Defendant Gallo did not offer or agree to disclose any of Plaintiff's alleged trade secret information to obtain a job offer from Defendant I-Minerals or any other potential employer. Defendant Gallo has also testified that he has not disclosed, and does not intend to disclose, any of Plaintiff's alleged trade secret information to Defendant I-Minerals or any other entity or person, and the Court has concluded that Defendant Gallo's admitted disclosure to Quartz Corp. is not sufficient at this stage to show actual disclosure of Plaintiff's alleged trade secrets. *See, e.g., Travenol Labs.,* 30 N.C. App. at 696 (injunction will not be issued "to restrain one from doing that which he is not attempting to do").

{61} Furthermore, there is no evidence of record at this time that Defendant I-Minerals attempted to lure Defendant Gallo away from Plaintiff's employment or that Defendant I-Minerals has sought or received any confidential information of Plaintiff from Defendant Gallo or from any other source. Plaintiff has not brought forward evidence suggesting this is a situation where the defendant has taken confidential information and gone to work soon thereafter for a competitor like in *Horner, Byrd's Lawn & Landscaping,* or *Barker,* where the courts found threats of misappropriation on such facts entitling the plaintiffs to injunctions.

{62} In addition, the statements in Defendant I-Minerals' press release and the company's apparent plan to develop HPQ in the future do not, in context and without more, establish a threat to Plaintiff from Defendant I-Minerals' hiring of

Defendant Gallo sufficient to justify injunctive relief. Defendant I-Minerals has testified that it does not intend to acquire or use any of Plaintiff's alleged trade secret information in the development of its HPQ products and has provided undisputed evidence that it relies on third party laboratories, such as the MRL lab in Asheville and the Dorfner lab in Germany, to purify its quartz with widely-known and long-used floatation and acid-leaching techniques. (Def. I-Minerals Resp. P.I. Mot., p. 8–9.) [11]

{63}    Accordingly, on balance and viewing the entirety of the record at this stage of the proceedings, the Court is not satisfied that Plaintiff has met its burden to present evidence of actual or threatened misappropriation of a nature that would entitle it to injunctive relief and, therefore, cannot conclude that Plaintiff has shown facts adequate to justify entry of a preliminary injunction based on an alleged violation of the NCTSPA. *See generally Milgrim on Trade Secrets* § 15.01 (2014) ("[C]ourts are not apt to enjoin on mere suspicion of the threat of wrongful use or disclosure"); *FMC Corp.*, 899 F. Supp. at 1481 (denying motion for preliminary injunction where plaintiff "has established a mere possibility of misappropriation that is insufficient to justify an injunction").

B.  Unfair and Deceptive Trade Practices

{64}    To prevail on a claim for violation of the Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C.G.S. § 75-1.1 (2014), Plaintiff must show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to [Plaintiff] or [its] business." *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 9, 472 S.E.2d 358, 362 (1996) (citations omitted).

---

[11] The Court notes that although Defendants have interpreted Plaintiff's contentions as advancing a theory of "inevitable disclosure," Plaintiff has advised that it is not proceeding under this theory. (Pl.'s Post-Hearing Brief, p. 4.) Accordingly, the Court will not address Defendant's arguments concerning the inapplicability of the doctrine here, except to note that the doctrine has not yet been firmly adopted by the North Carolina appellate courts. *See Analog*, 157 N.C. App. at 470, 579 S.E.2d at 454–55; *Allegis*, 2013 NCBC 13 ¶ 53.

{65}     Plaintiff hinges its claim under the UDTPA on Defendants' alleged violation of the NCTSPA.  Because the Court is not satisfied that Plaintiff has shown a likelihood of success on its claim under the NCTSPA, the Court therefore similarly concludes that Plaintiff has not presented sufficient evidence of Defendants' violation of the UDTPA to justify entry of a preliminary injunction.

C.  Breach of the 1997 Agreement

{66}     Plaintiff alleges that Defendant Gallo breached the 1997 Agreement by disclosing Plaintiff's confidential, proprietary, and/or trade secret information or materials "relating to any Product at any stage of its mining or processing, or in final form . . . ."  (Pl.'s Suppl. Br. Supp. P.I. Mot., p. 20.)  All parties agree that the 1997 Agreement is governed by Connecticut law.  A successful claim for breach of contract under Connecticut law requires "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."  *Rosato v. Mascardo*, 844 A.2d 893, 902 (Conn. App. Ct. 2004) (citation omitted).  A valid contract requires consideration. *State Nat'l Bank v. Dick*, 325 A.2d 235, 238 (Conn. 1973) (citation omitted).

{67}     As a preliminary matter, Defendant Gallo contends that the 1997 Agreement is not valid due to a lack of consideration.  Specifically, Defendant Gallo contends that there was no new consideration for the 1997 Agreement because he was already employed by Plaintiff when he signed the 1997 Agreement and received no further benefit from signing.  Plaintiff contends in response that the 1997 Agreement was executed by Gallo on the day he actually began his employment and hence was supported by consideration.  For purposes of deciding the P.I. Motion, the Court will assume without deciding that the 1997 Agreement is supported by consideration.

{68}     Plaintiff's evidence in support of its contract claim is largely the same as the evidence Plaintiff relied upon to show actual or threatened misappropriation under its NCTSPA claim.  (Pl.'s Suppl. Br. Supp. P.I. Mot., p. 21–22; Pl.'s Br. Supp. P.I. Mot., p. 15.)  Plaintiff's only evidence of actual breach is Defendant Gallo's email to Quartz Corp. referencing Plaintiff's removal of [REDACTED] and

[REDACTED] in the process of creating Iota-grade HPQ. As the Court concluded in assessing actual disclosure under the NCTSPA, however, the Court concludes that this information is not sufficient to show that Plaintiff is likely to prevail on its breach of contract claim in light of the public information Defendant I-Minerals has brought forward tending to show that [REDACTED] and [REDACTED] are routinely removed by all competitors in creating HPQ of all grades. (Def. I-Minerals' Resp. P.I. Mot., Exs. A–B.) *See, e.g., Town & Country House & Homes Service, Inc. v. Evans*, 189 A.2d 390, 393 (Conn. 1963) ("Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.").

{69} Moreover, Plaintiff's evidence of threatened harm is speculative at best to show that Plaintiff otherwise has a likelihood of success on its breach of contract claim. Accordingly, the Court concludes that Plaintiff has failed to show that it has a likelihood of success on its claim for breach of the 1997 Agreement and, thus, that a preliminary injunction on this basis is not justified.

D. Breach of Implied Duties of Good Faith and Fair Dealing in the 1997 Agreement

{70} Under Connecticut law, "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 67 A.3d 961, 986 (Conn. 2013) (citations omitted). The covenant of good faith and fair dealing "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Id.* To breach the covenant, "the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004).

{71} Plaintiff contends that it is likely to prevail on its claim for breach of the implied duties of good faith and fair dealing in the 1997 Agreement "because [Defendant] Gallo is working for [Defendant] I-Minerals in the identical field in

which he gained [Plaintiff's] confidential, proprietary, and trade secret information." (Pl.'s Suppl. Br. Supp. P.I. Mot., p. 22.)

{72}   For the reasons stated in section V(1)(C) above, however, the Court concludes that Plaintiff has not shown a likelihood of success on its claim for alleged breach of the implied duties of good faith and fair dealing and that therefore entry of a preliminary injunction on this basis is not proper.

E.   Other Equitable Considerations.

{73}   The Court notes that certain equitable considerations also weigh against entry of a preliminary injunction here. In particular, the fact that Plaintiff has already enjoyed the benefits of a lengthy five-year non-compete provision is a factor militating against an injunction enjoining Defendant Gallo from working for Defendant I-Minerals in these circumstances. Although North Carolina law is clear that a perpetual non-disclosure provision such as those contained in the 1997 and 2009 Agreements may be enforceable to protect a legitimate business interest of a former employer, *see Chemimetals Processing, Inc. v. McEneny*, 124 N.C. App. 194, 197, 476 S.E.2d 374, 376 (1996), the Court observes that some courts have found relevant in denying injunctive relief for alleged misappropriation the fact that, unlike here, the former employer did not obtain a non-competition agreement from the departing employee to protect its confidential information. *See, e.g., Analog Devices*, 157 N.C. App. at 471, 579 S.E.2d at 455 ("While [plaintiff] might have prevented [defendants] from working in the field of HSHR ADC design and development in the event they ceased working for [plaintiff] by making a non-compete clause part of their employment contract, no such clause has been presented."); *FMC Corp.*, 899 F. Supp. at 1479 ("[Plaintiff] never asked defendant to sign a covenant not to compete, and [defendant] never did so.").[12]

---

[12] Even where an enforceable non-disclosure agreement is present, North Carolina law permits a former employee to "take with him, at the termination of his employment, general skills and knowledge acquired during his tenure with his former employer," *Engineering Associates, Inc. v. Pankow*, 268 N.C. 137, 140, 150 S.E.2d 56, 58–59 (1966).

## 2. Irreparable Harm

{74}    In light of the Court's determination of Plaintiff's likelihood of success on the merits, Plaintiff cannot show at this stage that denial of a preliminary injunction will result in an irreparable injury to it or its business.

## VI. CONCLUSION

{75}    On balance, upon a review of the entire record before the Court at this time, the Court finds that Plaintiff has failed to present sufficient evidence to show that it is likely that it will succeed on the merits of its claims or that Plaintiff will suffer immediate and irreparable harm if a preliminary injunction is not granted.

{76}    Accordingly, the Court concludes that a preliminary injunction should not issue and hereby **DENIES** Plaintiff's P.I. Motion and **DISSOLVES** the TRO entered on August 13, 2014.

**SO ORDERED**, this the 4th day of September 2014.